**BRITISH STEEL PLC, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**USINAS SIDERURGICAS DE MINAS GERAIS, S.A., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**INLAND STEEL INDUSTRIES, INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**LTV STEEL CO., INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**LACLEDE STEEL CO., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**LUKENS STEEL CO., INC., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

Slip Op. 96–130.
Court Nos. 93–09–00550, 93–09–00558, and 93–09–00567 thru 93–09–00570–CVD.

United States Court of International Trade.

Aug. 13, 1996.

Regarding British Steel plc v. United States, Consol. Court No. 93–09–00550–CVD: Steptoe & Johnson, Washington, DC (Richard O. Cunningham, Peter Lichtenbaum), (Sheldon E. Hochberg, William L. Martin, II), on brief, (Richard O. Cunningham, Sheldon E. Hochberg), on oral argument, for British Steel plc; Morgan, Lewis & Bockius, Washington, DC (Mark R. Joelson), (Marcela B. Stras, Roger C. Wilson), on brief, for the Government of the United Kingdom, et al.; Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, Thomas R. Howell, Martha J. Talley, John A. Ragosta, Guy C. Smith, John R. Magnus, Jeffrey D. Nuechterlein, Philip Karter, Michael R. Geroe, Jennifer Danner Riccardi), on brief, (Martha J. Talley, John A. Ragosta), on oral argument, for Geneva Steel, et al.; Skadden, Arps, Slate, Meagher & Flom, Washington, DC (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance, Barry J. Gilman), on brief, (D. Scott Nance, Barry J. Gilman), on oral argument, for Geneva Steel, et al.

Regarding Usinas Siderurgicas de Minas Gerais, S.A., et al. v. United States, Consol. Court No. 93–09–00558–CVD: Willkie Farr & Gallagher, Washington, DC (Christopher S. Stokes), (William H. Barringer, Nancy A. Fischer), on brief, (Christopher S. Stokes), on oral argument, for USIMINAS; Dickstein Shapiro & Morin, Washington, DC (Arthur J. Lafave, III, Douglas N. Jacobson), for Companhia Siderurgica Nacional; Skadden, Arps, Slate, Meagher & Flom, Washington, DC (Robert E. Lighthizer, John J. Mangan), (Barry J. Gilman, D. Scott Nance), on brief, (Barry J. Gilman, Scott Nance), on oral argument, for Gulf States Steel, Inc., et al.; Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, John A. Ragosta, Guy C. Smith, Michael R. Geroe), on brief, (John A. Ragosta), on oral argument, for Gulf States Steel, Inc., et al.

Regarding Inland Steel Industries, Inc., et al. v. United States, Consol. Court No. 93–09–00567–CVD: Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on brief, (Martha J. Talley, John A. Ragosta, John R. Magnus), on oral argument, for Inland Steel Indus., Inc., et al.; Skadden, Arps, Slate, Meagher & Flom, Washington, DC (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (Barry J. Gilman, D. Scott Nance), on oral argument, for Inland Steel Indus., Inc., et al.; Weil, Gotshal & Manges LLP, New York City (Stuart M. Rosen), (M. Jean Anderson, Jeffrey P. Bialos, Diane M. McDevitt, Scott Maberry; and Stuart M. Rosen, Mark F. Friedman, Jonathan Bloom), on brief, (M. Jean Anderson, Stuart M. Rosen), on oral argument, for Usinor Sacilor, Sollac and GTS.

Regarding LTV Steel Co., Inc., et al. v. United States, Consol. Court No. 93–09–00568–CVD: Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, O. Julia Weller, Kristen M. Neller, Michael R. Geroe), on brief, (John A. Ragosta, Guy C. Smith), on oral argument, for LTV Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom, Washington, DC (John J.

Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, for LTV Steel Co., et al.; Sharretts, Paley, Carter & Blauvelt, P.C., New York City (Gail T. Cumins), for Thyssen Stahl AG, et al.; LeBoeuf, Lamb, Greene & MacRae, L.L.P., New York City (Pierre F. de Ravel d'Esclapon, New York City, Mary Patricia Michel), for AG der Dillinger Hüttenwerke; Hogan & Hartson, Washington, DC (Lewis E. Leibowitz, Steven J. Routh, Paul Minorini), for Fried, Krupp AG Hoesch–Krupp, et al.

Regarding Laclede Steel Co., et al. v. United States, Consol. Court No. 93–09–00569–CVD: Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Linda C. Menghetti, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on brief, (John A. Ragosta, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on oral argument, for Laclede Steel Co., et al. Armco Steel Co., et al. and Bethlehem Steel Corp., et al.; Skadden, Arps, Slate, Meagher & Flom, Washington, DC (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, for Laclede Steel Co., et al., Armco Steel Co., et al., and Bethlehem Steel Corp., et al.; Morrison & Foerster, Washington, DC (Donald B. Cameron), (Julie C. Mendoza, Craig A. Lewis, Sue–Lynn Koo, Panagiotis C. Bayz), on brief, (Donald B. Cameron, Julie C. Mendoza), on oral argument, Counsel for Dongbu Steel Co., et al.

Regarding Lukens Steel Co., et al. v. United States, Consol. Court No. 93–09–00570–CVD: Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, Scott L. Forseth, Michael R. Geroe), on brief, (John A. Ragosta), on oral argument, for Lukens Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom, Washington, DC (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, for Lukens Steel Co., et al.; Shearman & Sterling, Washington, DC (Jeffrey M. Winton), (Robert E. Herzstein, Shavit Matias), on brief, for Altos Hornos de Mexico, S.A. de C.V.

Regarding Geneva Steel, et al. v. United States, Consol. Court No. 93–09–00566–CVD: Dewey Ballantine, Washington, DC (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Michael R. Geroe), on brief, (Martha J. Talley, Michael R. Geroe), on oral argument, for Geneva Steel, et al.; Barnes, Richardson & Colburn, Washington, DC (Gunter von Conrad), for Fabrique de Fer Charleroi, S.A.; LeBoeuf, Lamb, Greene & MacRae, Washington, DC (Melvin S. Schwechter), for S.A. Forgess de Clabecq; O'Melveny & Myers, Washington, DC (Peggy A. Clarke, Gary N. Horlick), for Sidmar N.V. and TradeARBED, Inc.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC (A. David Lafer) (Jeffrey M. Telep, Velta A. Melnbrencis); Stephen J. Powell, (Terrence J. McCartin, Robert E. Nielsen, David W. Richardson, Elizabeth C. Seastrum, Marguerite Trossevin, Jeffrey C. Lowe), Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel for defendant.

### OPINION

CARMAN, Judge:

In *British Steel PLC v. United States,* 924 F.Supp. 139 (CIT1996) (*British Steel II* ), *appeals docketed,* Nos. 96–1401–06, (Fed.Cir. June 21, 1996), this Court stayed its consideration of the Department of Commerce's ("Department" or "Commerce") first privatization remand, *Final Results of Redetermination Pursuant to Court Remand on General Issue of Privatization* (dated July 17, 1995) (*Privatization Remand* ), as it pertained to *Certain Steel Products From Germany,* 58 Fed.Reg. 37,315 (Dep't Comm. 1993) (final determ.) (*German Final Determination* ), and of all issues related to or dependent upon privatization in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, consisting of *LTV Steel Co., Inc.,* et al. *v. United States,* Court No. 93–09–00568–CVD, *Thyssen Stahl AG,* et al. *v. United States,* Court No. 93–09–00585–CVD, *AG der Dillinger Hüttenwerke*

*v. United States,* Court No. 93–09–00596–CVD, and *Fried. Krupp AG Hoesch–Krupp and Krupp Hoesch Stahl AG v. United States,* Court No. 93–09–00603–CVD, pending this Court's jurisdiction pursuant to the remand from the Court of Appeals in *Saarstahl AG v. United States,* 78 F.3d 1539 (Fed.Cir.1996), *rev'g and remanding Saarstahl, AG v. United States,* 858 F.Supp. 187 (CIT1994). Through an April 30, 1996 order, in light of the petition for rehearing before the Court of Appeals in *Saarstahl*[1] and in the interest of expedition, this Court vacated the stay. In the same order, this Court also ordered Commerce to perform a second remand determination on privatization issues pertaining to the *German Final Determination.* The present opinion addresses the second remand determination, *Final Results of Redetermination Pursuant to Court Remand on Certain Factual Issues Regarding the Privatization in Germany* (dated May 22, 1996) (*Redetermination*), as well as all country-specific challenges related to privatization presented in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD. This Court has jurisdiction over this matter under 28 U.S.C. § 1581(c) (1988).

### APPLICATION OF U.S. CIT R. 54(B)

■ U.S. CIT R. 54(b) provides in part:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

As explained by the Court,

Underlying rule 54(b) is the recognition that with the liberal joinder of claims now permitted by the federal rules, the policy against piecemeal appellate review implicit in the "single judicial unit" rule must be weighed against the prejudice caused by unjustified delay which can occur when

decisions final as to some claims cannot be entered until the litigation is final as to all claims. In other words, a claim may be certified for appeal under rule 54(b) if a decision on that claim represents a "final decision" in the sense of an ultimate disposition of an individual claim entered in the course of a multiple claim action and if there is no just reason for delay.

*Timken Co. v. Regan,* 5 CIT 4, 6, 1983 WL 4993 (1983) (citation omitted).

In accordance with a February 18, 1994, scheduling order in this proceeding, parties were jointly ordered to brief five general issues involved in various groupings of the consolidated cases under review. *See British Steel II,* 924 F.Supp. at 147, 151. That scheduling order also set forth a schedule for the parties to submit individual briefs on a country-specific basis. Privatization issues were raised in several of the complaints and country-specific briefs, including two of the complaints in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD. The present opinion will result in the final resolution of all issues presented in Commerce's *Redetermination* as well as all country-specific challenges related to privatization presented in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD.

The Court will enter final judgment using Rule 54(b) for purposes of rendering claims related to privatization immediately appealable. Specifically, the Court will enter final judgment pursuant to Rule 54(b) in the country-specific case *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, as to: (1) counts I, II, and III in the complaint of AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel, Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a Unit of USX Corporation, and WCI Steel, Incorporated (collectively

---

**1.** The Court of Appeals has since denied the petition for rehearing, and has issued a mandate on *Saarstahl*.

"Domestic Producers") filed in *LTV Steel Co., Inc. v. United States,* Court No. 93–09–00568–CVD; and (2) the complaint of Dillinger filed under *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD. This Court's decision resolving these privatization issues is a decision upon cognizable claims for relief.

Having determined that this Court is dealing with a "final judgment" on specific claims, the Court now determines that the final judgment on the above-specified counts in the Domestic Producers' complaint, and the entire complaint of Dillinger, in country-specific *LTV Steel Co., Inc., et al. v. United States,* Consol.Court No. 93–09–00568–CVD, are immediately appealable under Rule 54(b). *See Timken,* 5 CIT at 6. There is no just reason for delay. This Court's decision in *British Steel II,* which ruled upon privatization issues affecting other cases in the joint proceeding, is currently on appeal before the Court of Appeals. The parties and this Court have spent a great deal of time and other resources sifting through the privatization issues in all of these cases. In the interest of conserving judicial and the parties' resources, the Court finds it more desirable that, if further issues of privatization are to be appealed, they are appealed by as many affected parties as possible, and as concurrently as possible with this Court's prior decisions on these issues.

In two distinct sections of the present opinion, this Court will address the *Redetermination* and then all country-specific issues related to privatization in *LTV Steel Co., Inc., et al. v. United States,* Consol.Court No. 93–09–00568–CVD. Country-specific issues raised in *LTV Steel Co., Inc., et al. v. United States,* Consol.Court No. 93–09–00568–CVD, that are not dependent in any way on privatization will be addressed in a future, separate opinion.[2]

### STANDARD OF REVIEW

In reviewing determinations and remand determinations by Commerce, this Court will hold unlawful those found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)).

## I. *Commerce's* Redetermination

### BACKGROUND

By order dated April 30, 1996, this Court ordered Commerce to: (1) set forth Commerce's factual findings on the *entire* transaction at issue in the *German Final Determination,* which resulted in DHS–Dillinger Hütte Saarstahl's (DHS) ownership of AG der Dillinger Hüttenwerke (Dillinger) and Saarstahl AG (SAG), with clarity, finality, and a more thorough and comprehensive explanation than was provided in Commerce's *Privatization Remand* discussed in *British Steel II;* (2) determine to whom the subsidies at issue were provided; (3) if an enterprise to whom subsidies were provided was subsequently privatized, explain whether that enterprise continued to be, for all intents and purposes, the same enterprise after the privatization such that Commerce may continue to countervail that entity, as discussed in *British Steel plc v. United States,* 879 F.Supp. 1254 (CIT1995) (*British Steel I*), *appeals docketed,* Nos. 96–1401–06, (Fed.Cir. June 21, 1996), and *British Steel II;* (4) if parties to the transaction at issue discounted any aspects of purchase price to account for countervailing duty liability, as discussed in *British Steel II,* explain this and its effect on the transaction and the outcome of countervailing duty liability for the parties involved, and explain Commerce's statutory authority permitting such findings; (5) explain Commerce's statement in its first remand on privatization at page 21 n. 37 that "because DHS owned SAG, the former SVK/DHS's assets and liabilities remained with DHS, albeit indirectly, even after the transfer of the assets and liabilities of the former SVK/DHS to the newly-created SAG"; (6) determine whether Commerce may properly countervail DHS, Dillinger, SAG, or any other

---

**2.** In setting oral argument on non-privatization issues in *LTV Steel Co., Inc.* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, this Court ordered that "no party shall present oral argument, at the November 9, 1995 hearing, on any

issue that could be mooted by, or otherwise depends upon, the outcome of the general issue of privatization." *See LTV Steel Co., Inc.* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD (Nov. 7, 1995) (order).

party as a result of the transaction at issue; (7) if Commerce determines that DHS was provided with subsidies but that Dillinger and/or SAG are somehow liable for those subsidies, explain why this is so and under what authority Commerce may countervail Dillinger and/or SAG for subsidies provided to DHS. *See British Steel plc v. United States,* Consol.Court No. 93–09–00550–CVD at 3–4 (Apr. 30, 1996) (order).

In the *Redetermination,* Commerce concludes it may properly countervail Dillinger for the full amount of subsidies received prior to the privatization transaction at issue in the *German Final Determination. Redetermination* at 1. In so doing, Commerce sets forth a description of the transaction at issue as follows. Prior to 1989, the Governments of Germany and Saarland provided "massive amounts of assistance" to a company named Saarstahl Volkingen GmBH (SVK) "and its predecessor companies." *Id.* at 5. Repayment was contingent upon SVK's return to profitability.

In April 1989, the Government of Saarland (GOS) owned 76 percent of SVK, and Arbed, a Luxembourg company, owned 24 percent. On April 20, 1989, the GOS and Arbed agreed with Usinor Sacilor, a company owned by the French government, to combine SVK with another German steel producer owned by Usinor Sacilor, Dillinger.[3] Two independent accounting firms appraised the relative values each party would contribute to the combined entity in order to determine each party's percentage share of ownership in the newly-combined entity. The Governments of Germany and Saarland forgave all of the outstanding debts owed to them by SVK on June 14, 1989, as a precondition to the combination of SVK and Dillinger. In addition, private creditors forgave a portion of the debt SVK owed to them.[4]

[O]n June 15, 1989, a series of events occurred. First, SVK's name was changed to DHS Dillinger Hutte Saarstahl AG (DHS), and its legal form was changed from GmBH (a limited liability corporation) to AG (a German stock company), so that DHS could issue stock. These change had no impact on the assets and remaining liabilities of SVK, *i.e.,* all assets and liabilities of SVK (including SVK's tax loss carryforward) continued to reside in DHS.

Then, the stated capital of the company now called DHS was reduced from DM 330 million to DM 12.5 million. The stated capital was reduced to cover accumulated losses of SVK. However, the relative ownership percentages of GOS (76 percent) and Arbed (24 percent) remained the same. The ownership interests of GOS and Arbed represented DM 9.5 million and DM 3 million of the company's stated capital, respectively.

Next, ... the stated capital of DHS was increased to DM 300 million. The increase in the company's stated capital was based on the contributions to be made by the GOS, Usinor Sacilor and Arbed. The GOS provided a cash contribution of DM 145.1 million, in addition to its existing DM 9.5 million of DHS's stated capital. This cash contribution of DM 145.1 million was divided as follows: DM 73 million in stated capital and DM 72.1 million in surplus capital. Arbed, along with its existing DM 3 million of stated capital, made an additional cash contribution of DM 8.9 million (DM 4.5 million as stated capital and 4.4 million as surplus capital). Usinor Sacilor made an in-kind contribution into DHS consisting of its shares of Dillinger. Usinor Sacilor's contribution in kind was valued at DM 417.3 million; DM 210 million

---

**3.** In the *Redetermination,* Commerce refers to "AG der Dillinger Huttenwerke" as "Dillinger," but also abbreviates "Dillinger Huttenwerke" as "Dillinger." This Court will assume that all of Commerce's references to "Dillinger" are references to AG der Dillinger Hüttenwerke.

**4.** Commerce elaborates on the debt forgiveness as follows:

The debt forgiveness of the two governments and the private creditors was the subsidy found by the Department to have been bestowed upon SVK. Dillinger received benefits directly under the Capital Investment Grants program and the Investment Promotion Act. The SVK debt forgiveness accounted for the vast proportion of the final rate calculated in the *Privatization Remand.* Without inclusion of the debt forgiveness, Dillinger's rate would be *de minimis.*

*Redetermination* at 6 n. 2.

went into stated capital and 207.3 into surplus capital.

*Id.* at 6–7 (footnote omitted). Subsequent to the parties' contributions, the GOS owned 27.5 percent of DHS, Usinor Sacilor owned 70 percent, and Arbed owned 2.5 percent. DHS issued non-transferrable shares to the GOS, Arbed, and Usinor Sacilor based on the amount each had contributed towards the stated capital of DHS.

Subsequently on June 30, 1989, DHS transferred all assets, except for the tax loss carryforward, "and liabilities of the former SVK into a newly created, 100 percent owned, corporate subsidiary, Saarstahl AG (SAG). Thus, DHS became a holding company with two operating subsidiaries, SAG and Dillinger." *Id.* at 8.[5] Under "profit and loss agreements" both subsidiaries signed with DHS, DHS held ultimate management authority, all profits were to be transferred to DHS, and DHS would assume any current year losses. This transaction, combining SVK and DHS, "was designed so that the tax loss carryforward previously generated by SVK would continue to benefit DHS even after the combination with Dillinger and the creation of SAG." *Id.* (footnote omitted).

Commerce determines in the *Redetermination* that SVK was partially privatized after the events of June 15, 1989.[6] This partial privatization "was neither a sale of assets nor a simple stock sale. Rather, the privatization of SVK was achieved by means of a combination with another corporation and the exchange of stock." *Id.* at 7–8 (footnote omitted). Commerce concludes

the privatization of SVK was, in essence, a two-step process. Pursuant to the first step of the transaction, SVK's name was changed to DHS and it became a stock company. SVK's assets, rights and liabilities simply became the assets, rights and liabilities of DHS. In the second step of

the transaction, DHS was combined with Dillinger.

*Id.* at 9.

On the issue of to whom the subsidies in question were provided, Commerce determines that the Governments of Germany and Saarland's and private banks' forgiveness of debt owed to them by SVK in 1989 constitutes a subsidy: "Because this debt forgiveness was specific to an enterprise and bestowed a benefit, the Department determined that a countervailable subsidy was provided.... [T]his subsidy was 'provided to,' and received by, SVK...." *Id.* Commerce further explains, the day after this subsidy was provided to SVK, SVK was privatized:

In the first step of the privatization transaction, SVK simply changed its name to DHS and its corporate form from GmBH (a limited liability corporation) to AG (a German stock company), so that it could issue stock. As discussed in the *Privatization Remand,* we have determined DHS, for all intents and purposes, to be the same as SVK, the entity which received the subsidies.

*Id.* at 9–10 (footnotes omitted). Commerce further explicates this point as follows:

Based on our analysis of the transaction ... we determine that DHS/Dillinger—the post-privatization entity—remained for all intents and purposes the same entity as SVK/DHS—the pre-privatization entity which received the subsidy. Pursuant to the second step of the transaction, the GOS exchanged its interests in SVK/DHS for a minority equity position in DHS/Dillinger. Usinor Sacilor exchanged its interest in Dillinger for a majority equity interest in DHS/Dillinger. Thus, while the identity of the shareholders who held ownership interests in DHS/Dillinger, as well as the relative shareholdings of pre-privatization shareholders, differed from those in SVK/DHS, there was no change in DHS/Dillinger's corporate identity. The fact that DHS/Dillinger subsequently held

---

**5.** Commerce reports "DHS owned 100 percent of SAG and 95 percent of Dillinger." *Redetermination* at 8 n. 6.

**6.** Commerce explains that "[f]or purposes of this remand, ... partial privatization refers to a pri-

vatization in which the government continues to maintain an ownership interest in the corporate entity in question post-privatization." *Redetermination* at 7 n. 4 (citations omitted).

the shares of Dillinger does not alter the fact that DHS/Dillinger is, for all intents and purposes, the same entity that received the subsidies, SVK/DHS. The contribution of assets to a corporation in exchange for shares of the corporation does not alter the corporate identity. Most importantly, all of SVK/DHS's assets and liabilities remained, directly or indirectly, with DHS/Dillinger.

*Id.* at 10–11 (footnote omitted).[7] Commerce adds that the transaction was designed to allow the tax loss carryforward to continue to benefit DHS after the combination with Dillinger. Under German income tax law, DHS, not SAG, is SVK's successor company. Additionally, "under German income tax law, a condition of eligibility for a tax loss carryforward is the 'corporation's legal and financial identity with the corporation that incurred the losses.'" *Id.* at 12 (footnote omitted).

As to whether parties to the transaction discounted any aspect of the purchase price to account for countervailing duty liability, Commerce explains that while this issue was not specifically pursued during the underlying investigation, "nothing contained in the appraisal report of the independent accounting firm ... indicates that any of the parties explicitly took into account a future potential countervailing duty liability." *Id.* at 12–13 (footnote omitted). Furthermore, "given that SVK was not privatized by means of an

asset sale, such an inquiry, under the Court's approach, does not appear to be relevant." *Id.* at 13 (footnote omitted).

Commerce also attempts to explain its statement in the *Privatization Remand* that "because DHS owned SAG, the former SVK/DHS's assets and liabilities remained with DHS, albeit indirectly, even after the transfer of the assets and liabilities of the former SVK/DHS to the newly-created SAG." *Privatization Remand* at 21 n. 37. Commerce explains that DHS, as the holding company, owned SAG and Dillinger as subsidiaries. "Thus," according to Commerce, "all the assets and liabilities of SAG remained, albeit indirectly (*i.e.*, by means of a holding company/wholly-owned subsidiary corporate relationship), with DHS, SAG's 'parent' corporation." *Redetermination* at 13–14.[8]

On the issue of whether Commerce may countervail DHS or any other party, Commerce reasons it may properly countervail the production of DHS because: (1) the subsidies at issue were "provided to" SVK; (2) SVK is for all intents and purposes the same as pre-combination, pre-privatization DHS; and (3) pre-combination, pre-privatization DHS is for all intents and purposes the same as post-combination, post-privatization DHS. "Therefore," Commerce reasons, "the Department properly calculated countervailing duties against Dillinger's production equal to the allocated portion of the subsidies attrib-

---

7. On the transfer of assets and liabilities, Commerce adds:

DHS/Dillinger does not cease to be for all intents and purposes the same entity which received the subsidies simply because most of SVK/DHS's assets and liabilities were transferred to the newly-created operating subsidiary SAG two weeks after the privatization. The privatized DHS/Dillinger continued to benefit from those assets and to be responsible for the remaining liabilities after the transfer to SAG, just as it had after the combination with Dillinger but prior to the creation of SAG.

*Redetermination* at 11 n. 13. Commerce also reprints the portion of its *Privatization Remand* in which Commerce noted:

The Court did not provide specific instructions as to how the Department should determine whether the privatized entity is the same "for all intents and purposes" as the pre-privatized entity. Because a corporation is nothing more than an artificial legal person with a collection of assets and liabilities, when the

corporate form changes but the assets and liabilities remain in the new legal entity, we find it reasonable to conclude, for purposes of this remand determination, that the post-privatization entity is the same for all intents and purposes as the pre-privatization entity. While other interpretations of the Court's order with respect to this issue are also possible, we believe our interpretation most closely adheres to the letter and spirit of the Court's decision.

*Privatization Remand* at 31, *reprinted in Redetermination* at 11 n. 14. Commerce claims its "reasoning was implicitly endorsed by the Court when it upheld the Department with respect to the privatization in the United Kingdom." *Redetermination* at 11 n. 14 (citing *British Steel II*, 924 F.Supp. at 190).

8. Commerce quotes *Black's Law Dictionary* for the proposition that "[h]olding companies exist for the purpose of 'owning stock in, and supervising management of, other companies.'" *Redetermination* at 13 n. 20 (quoting *Black's Law Dictionary* 658 (5th ed. 1979)).

utable to Dillinger." *Id.* at 14. Commerce further explains:

> As nothing more than a holding company, DHS neither produces nor exports merchandise of any kind.... DHS's two subsidiaries, Dillinger and SAG, did produce and export merchandise during the period of investigation. Therefore, the subsidies received by DHS are attributable to the production of Dillinger and SAG as subsidiaries of DHS. Accordingly, the production of both Dillinger and SAG are receiving the current benefit of previously-bestowed subsidies. Of the two, only Dillinger produced subject merchandise.

*Id.*

On the issue of why Dillinger and/or SAG are liable for subsidies, Commerce explains that in accordance with its practice of treating domestic subsidies as "untied,"[9] Commerce "has long attributed domestic subsidies received by holding companies (other than multinational holding companies) over the total sales of all subsidiaries owned or otherwise controlled by the holding company, absent evidence that the subsidies were 'tied' to a particular product or market." *Id.* at 16 (footnote omitted). Although Dillinger has argued that the subsidies at issue were tied to SVK's production, Commerce explains, the benefits of debt forgiveness were not tied to any specific product or market.[10] Thus, Commerce reasons, it properly allocated the benefits over all of DHS sales.

### CONTENTIONS OF THE PARTIES

#### A. *Dillinger*

Dillinger argues against Commerce's *Redetermination.* Dillinger first complains

that despite Commerce's earlier finding that the transaction at issue involved a sale of assets, Commerce has now concluded on the same set of facts that the transaction " 'was achieved by means of a combination with another corporation and the exchange of stock.' " (Initial Comments on May 22 Remand Results (Dillinger's Comments) at 1–2 (quoting *Redetermination* at 7–8).)[11] Dillinger argues Commerce's classification of the transaction as " 'a combination with another corporation and the exchange of stock' is factually misleading and incomplete and confuses the mechanics of the transaction with its substance and intent." (*Id.* at 2.) According to Dillinger, no merger or consolidation occurred. Furthermore, Dillinger argues, Commerce

> also fails to follow its own rule that form rather than substance should govern the determination of subsidies by exploiting the form of this transaction at the expense of the substance to achieve a result that is not otherwise available. By focusing on the mechanics of capturing SVK's tax-loss carryforward, a valuable but nonetheless secondary component of the transaction, as the linchpin for finding DHS to be the company that benefitted from the subsidies bestowed upon SVK, [Commerce] gives primacy to form over substance. Had there been no tax-loss carryforward, the GOS would have still received its proportionate shares in the holding company created for its contribution in the amount of SVK's assets plus cash,[12] but the market-based value of those assets would have been less, and the GOS would therefore

---

9. Commerce defines "untied" as "meaning the denominator will include the firm's total sales." *Redetermination* at 16 (citation omitted).

10. Commerce provides the following support for this statement: (1) nothing on the record indicates the debt forgiveness was tied; (2) the acknowledged intent of the debt forgiveness was to improve the overall financial condition of SVK for its combination with Dillinger; (3) the debt forgiveness was a pre-condition to the combination transaction; (4) Dillinger and SAG has profit and loss agreements with DHS requiring Dillinger and SAG to transfer profits to DHS and requiring DHS to assume any losses; and (5) Dillinger does not make profits for tax purposes, but rather its income is imputed to DHS.

11. Dillinger explains it "fully agrees" with Commerce that the form of the transaction should not be determinative, "and has argued throughout these proceedings that there was no benefit from prior subsidies in this case because SVK was privatized at market value in an arm's-length transaction on terms consistent with commercial considerations." (Dillinger's Comments at 1 n. 2 (citation omitted).)

12. Dillinger adds, "As is clear in the record, since there was never any intent by the parties to merge productive operations, the holding company was always contemplated." (Dillinger's Comments at 3 n. 6.)

have had to have contributed more cash to obtain its desired proportionate share. The tax-loss carryforward has become a means of diverting attention from the fact that [Commerce] cannot produce a valid theory to support its finding that DHS is the subsidy recipient, so that it can, in turn, countervail Dillinger.

(*Id.* at 3 (additional footnote omitted).) Additionally, Dillinger asserts Commerce erroneously uses the terms "DHS/SVK" and "DHS/Dillinger" when in fact "there was no pre-privatization DHS. DHS was created in the transaction solely to hold the two steel-producing operating subsidiaries...." (*Id.* at 4.)

Second, Dillinger purports to clarify Commerce's recitation of the facts regarding the transaction. According to Dillinger, SVK became SAG and Dillinger remained a separate, independent operating subsidiary. Therefore, "it is incorrect to state in the description of the transaction that parties contributed to or received shares in a 'combined' entity when the only entity to which parties contributed was DHS." (*Id.*) Dillinger further asserts that the "debt forgiveness" was not a precondition of a combination of SVK and Dillinger because SVK and Dillinger remained independent operating subsidiaries after the transaction just as they were prior to the transaction.

Third, Dillinger agrees with Commerce that the subsidies at issue were provided to SVK, and that Dillinger received *de minimis* levels of actual subsidies. Dillinger disagrees, however, with Commerce's finding that post-privatization DHS is for all intents and purposes the entity that received the subsidies. According to Dillinger, "all but the shell of SVK" was spun off to SAG. In fact,

none of the attributes of the post-privatization DHS give the agency any basis upon

which to justify the conclusion that it is, in essence, SVK. At the same time, the agency refused to even consider whether [SAG] was for all intents and purposes the same entity that received the subsidies.

(*Id.* at 6.) Furthermore, Dillinger argues,

virtually everything that Usinor Sacilor received of SVK in the transaction was spun down into a separate operating subsidiary, [SAG], as an integral part of the transaction. The creation of Saarstahl as Usinor Sacilor's long products production subsidiary in Germany was not simply another step in the transaction, it was the whole point of [sic] transaction.

(*Id.*)

Fourth, Dillinger agrees with Commerce that the parties did not discuss discounts in the purchase price. Dillinger comments, however, that any "notion of discounts is theoretical at best, and it is very unlikely that foreign companies would base their purchase price on something as speculative and unpredictable as a potential U.S. countervailing duty case sometime in the future, rather than on the market." (*Id.* at 6 n. 10.)[13]

Fifth, Dillinger argues that even if DHS is deemed to be the subsidy recipient, Commerce has failed to explain why Dillinger should be charged with the benefit. "[I]t is questionable whether, even if the SVK benefits were deemed to be attributable to the parent company, they could then flow to an uninvolved, unsubsidized subsidiary, based on a second presumption, particularly in light of verified evidence to the contrary conclusively rebutting that presumption in this case." (*Id.* at 7 n. 11.) Furthermore, in light of the record, "even if benefits were found to flow through from SVK after the privatization, no other entity except [SAG] could reasonably be considered 'for all intents and purposes' the entity that received the subsidies." (*Id.* at 7–8.)

---

13. Dillinger further explains:

[I]t is worth noting that the notion of discounts has little meaning when the company under discussion has a negative net worth to begin with, as in this case. This notion would seem have [sic] validity only if it could be shown that the company's assets might retain the value represented by subsidies used to purchase

them at the time of privatization. The fact that the company was in a negative net worth position was the primary reason the acquisition in this case focused on the *assets* of SVK as the GOS contribution to DHS. Whatever the company's overall net worth on its books, its assets had a specific market value that could be, and was, calculable.

(Dillinger's Comments at 6 n. 10.).

Finally, Dillinger does not challenge Commerce's "practice that, normally, general subsidies bestowed directly on a parent company may be attributed to its subsidiaries. However, ... there must first be a legitimate finding that the general subsidies were bestowed upon the parent company in the first instance." (*Id.* at 8.) In the present case, "the bestowal of such subsidies must have taken place while the companies were subsidiaries of the parent." (*Id.* (footnote omitted).) Dillinger further argues it is incorrect to say "that subsidies to SVK, which produced only long products, were not tied to the production of any particular product; therefore, they retained the character of a 'general' subsidy, the benefits of which were allegedly enjoyed by Dillinger, a separate steel plate producing subsidiary, after the transaction." (*Id.*) Dillinger argues there were no benefits for it to enjoy in this case, and Commerce has not identified any.

### B. *Commerce*

Commerce first argues it reasonably determined DHS was for all intents and purposes the same entity that received the subsidy, SVK. In light of this finding, Commerce argues, it also correctly determined it could properly impose countervailing duties on the production of the two subsidiaries, Dillinger and SAG: "[S]ubsidies received by holding companies such as DHS (other than multinational holding companies) are attributable over the total sales of all subsidiaries owned or otherwise controlled by the holding company, absent evidence that the subsidies were 'tied' to a particular product or market." (Rebuttal of the U.S. to the Initial Comments of AG der Dillinger Huttenwerke (Commerce's Resp.) at 4 (citation and footnote omitted).)

Second, Commerce argues it complied with the remand order, and the *Redetermination* is reasonable and fully supported by the record. Commerce contends Dillinger has downplayed the complexity of the transaction. Commerce's analysis, the agency argues, "[f]ar from elevating form over substance, ... goes to the heart of the German privatization and what was sought to be accomplished." (*Id.* at 5.) Commerce points

to a number of its findings in the *Redetermination*, including Commerce's taking into account the spin-off of SAG. Commerce further argues its *Redetermination* fully comports with *British Steel I* and *British Steel II*. Dillinger has offered no alternative view, Commerce maintains, to the agency's reasoning that

> "[t]he Court did not provide specific instructions as to how the Department should determine whether the privatized entity is the same 'for all intents and purposes' as the pre-privatized entity. Because a corporation is nothing more than an artificial legal person with a collection of assets and liabilities, when the corporate form changes but the assets and liabilities remain in the new legal entity, ... the post-privatization entity is the same for all intents and purposes as the pre-privatization entity."

(*Id.* at 7–8 (quoting *Redetermination* at 11 n. 14 (citation omitted)).) Additionally, Commerce asserts, this Court "has implicitly endorsed this interpretation by sustaining Commerce's determination with respect to the privatization in the United Kingdom." (*Id.* at 8 (citing *British Steel II* ).)

Finally, Commerce contends that "[n]either Commerce nor this Court have ever required that for subsidies to be attributable to the production of a subsidiary, that subsidiary must have been under the control of the parent at the time the subsidies were bestowed." (*Id.*) Regardless, Commerce argues, such a rule does not preclude a finding Dillinger benefitted here:

> [T]he purpose of forgiving the debt was not just to benefit SVK; it was also a precondition for Usinor Sacilor to enter the privatization by exchanging its interest in Dillinger and thereby acquiring its majority interest in DHS. The next day, after SVK changed its name to DHS and Usinor Sacilor had, in fact, contributed its interest in Dillinger, the entire newly privatized company (including Dillinger) began enjoying the benefits of the forgiven debt. Thus, the benefit of the debt forgiveness was attributable to Dillinger's production from the outset of the privatization.

(*Id.* at 8–9 (citation omitted).) Furthermore, Commerce argues, the tax loss carryforward and the profit and loss agreements indicate Dillinger's financial condition cannot be isolated from DHS and SAG. Instead, "'the financial status and health of all three companies was closely intertwined.'" (*Id.* at 9 (quoting *Redetermination* at 18).) Commerce also points to its finding in the *Redetermination* that nothing on the record indicates the debt forgiveness was tied to the production of any specific product.

## C. Domestics

Domestics support the *Redetermination.* First, Domestics argue Commerce fully complied with this Court's remand instructions. Second, Domestics argue the *Redetermination* is supported by substantial evidence on the record and is otherwise in accordance with law.

Domestics point to a number of "critical uncontested facts of record relating to the transaction," and argue Commerce "reasonably concluded that as part of the privatization, everything (assets, rights, and liabilities) that was the subsidized SVK became SVK/DHS and then the privatized DHS/Dillinger." (Domestic Producers' Rebuttal to Initial Comments of AG der Dillinger Huttenwerke (Domestics' Comments) at 2–3.) Domestics dispute Dillinger's assertion Commerce failed to take into account the spin-off of remaining assets and liabilities to SAG: "The spin-off occurred *after* SVK was privatized.... Under the Court's analysis, the central inquiry is whether the subsidized pre-privatization entity 'continued to be, for all intents and purposes, the same enterprise *after the privatization* such that Commerce may continue to countervail that entity.'" (*Id.* at 4 (footnote omitted).) Thus, Domestics continue,

> the spin-off of SAG after the privatization of SVK is no different than any other post-subsidy reorganization of a subsidy recipient, which, in accordance with the agency's practice, and ... has no effect on the allocability of subsidies to all of the recipient's production (including that of its divisions or subsidiaries), unless the subsidies are tied (which these are not).

(*Id.* at 4–5 (footnote omitted).) Additionally, Domestics maintain, Commerce has not placed form over substance: "As Dillinger has previously conceded, the '*only reason*' for structuring the transaction in this manner was to ensure that the tax loss carryforward would remain with DHS to the benefit of DHS and both of its subsidiaries. Here form follows function." (*Id.* at 5 (footnote omitted).) Moreover, Domestics add, DHS, not SAG, was the intended beneficiary of the transaction in the first instance. And, even if the spin-off was relevant, Commerce correctly found those assets, rights, and liabilities remained indirectly with DHS as SAG's parent company.

Domestics also argue the debt forgiveness subsidy provided to SVK was, legally and factually, untied:

> [T]here is no indication on the record that the debt forgiveness subsidy was intended to benefit the production of any specific product or products.... Rather, the record demonstrates that the debt was forgiven to improve the financial condition of SVK so that it could be sold without impairing the new entity.

(*Id.* at 8 (footnote omitted).) As to Dillinger's argument that Commerce has failed to identify any benefit to Dillinger, Domestics answer that Commerce is not required to identify effects once a subsidy is bestowed. Regardless, Domestics argue, "as Dillinger's financial results are intertwined with those of DHS/Dillinger in accordance with, for example, the profit and loss agreement, Dillinger certainly benefitted from the debt forgiveness." (*Id.* at 9.)

## DISCUSSION

■ In the beginning of the *Redetermination,* Commerce states:

> While complying with the instructions of the Court, the Department strongly disagrees with the fundamental premise of the Court's earlier decisions that the form of the privatization transaction (*i.e.,* asset sale versus stock sale) is the principal factor to be examined when determining the Department's authority to impose countervailing duties on a post-privatization entity. A privatization transaction can be struc-

tured as an asset sale or stock sale. The particular form a privatization takes (*i.e.,* asset sale versus stock sale) should not be determinative of whether or not, or, the extent to which, the privatized entity may be continuing to benefit from prior subsidies.

*Redetermination* at 1. Commerce's statement is a misreading of this Court's opinions. In *British Steel II,* this Court directly addressed the same misinterpretation, which Commerce had included in the first remand determination. This Court stated as follows:

> The Court's remand instructions in *British Steel [I]* explicitly required consideration of substance. This Court ordered Commerce to determine "the terms and *substance* of each transaction," and "whether, ... if a privatization or partial privatization took place, *the privatized entity continues to be, for all intents and purposes, the same entity* that received subsidies prior to the privatization or partial privatization transaction."
>
> . . . .
>
> The error lies in Commerce's conclusion that it is to examine "in some circumstances" substance as well as form. Although form may be an indicator of whether an entity survives a privatization transaction, substance, not form, is the key. It is Commerce's duty, and not the duty of this Court, however, to determine when form is not a true indicator of sub-

stance, and how then to determine whether the entity that received subsidies survives the privatization transaction.

*British Steel II,* 924 F.Supp. at 157–58 n. 25 (citation omitted). This Court also stated that

> form is subordinate to substance. As this Court explained in *British Steel [I],*
>
> > [i]t is conceivable that foreign governments, transferors, and transferees could try to structure their privatization transactions to evade potential tariff liability under United States' CVD laws.... Commerce, using its considerable expertise and insisting that such transactions be based upon good faith commercial considerations, should be able to ferret out sham transactions.

*Id.* at 157 (quoting *British Steel I,* 879 F.Supp. at 1277 and *id.* at 1277 n. 35 ("Presumably, if the only reason governments are structuring privatization transactions is to evade countervailing duties, and do so without commercial considerations, Commerce will look upon such transactions with disfavor.")) (footnote omitted).

The Court is deeply concerned with Commerce's repetition of a misinterpretation, which this Court took pains to correct in its last decision on this issue, because it has the potential to effect this proceeding.[14] Furthermore, Commerce's misinterpretation in the *Redetermination* are belied not only by its own comments on the *Redetermination,*[15]

---

**14.** The Court stresses its alarm at Commerce's actions. Either Commerce simply does not understand this Court's opinions, or it is purposefully attempting to misstate them in order to affect the outcome of these proceedings. If in the future this Court discerns any willful disregard of its opinions and orders, it may find it appropriate to invoke U.S.CIT R. 11.

**15.** For example, Commerce responds to Dillinger's criticism that the *Redetermination* "gives primacy to form over substance," as follows: "Far from elevating form over substance, Commerce's analysis goes to the heart of the German privatization and what was sought to be accomplished." (Commerce's Resp. at 5.) Additionally, Commerce restates in the *Redetermination* its interpretation of this Court's initial remand instructions, equally applicable to the *Redetermination:*

> "The Court did not provide specific instructions as to how the Department should deter-

mine whether the privatized entity is the same 'for all intents and purposes' as the pre-privatized entity. Because a corporation is nothing more than an artificial legal person with a collection of assets and liabilities, *when the corporate form changes but the assets and liabilities remain in the new legal entity, we find it reasonable to conclude, for purposes of this remand determination, that the post-privatization entity is the same for all intents and purposes as the pre-privatization entity.* While other interpretations of the Court's order with respect to this issue are also possible, we believe our interpretation most closely adheres to the letter and spirit of the Court's decision."

*Redetermination* at 11 n. 14 (emphasis added) (quoting *Privatization Remand* at 31).

The Court also notes Domestics' comments on the *Redetermination* echoing those of Commerce. (*See* Domestics' Comments at 5 ("Nor has the Department placed form over substance. As Dillinger has previously conceded, the *'only reason'*

but also by the remainder of the *Redetermination* itself which gives primacy to substance over form.

■ In the *Redetermination,* Commerce has concluded that SVK, the enterprise to whom subsidies were provided, is for all intents and purposes DHS. Commerce has reached this conclusion despite: (1) the transfer of all assets of DHS, except for the tax loss carryforward, and all liabilities of DHS, formerly SVK, to SAG; and (2) what Commerce describes as the "combination" of DHS and Dillinger. These two factors did not alter Commerce's conclusion that SVK is, for all intents and purposes, DHS apparently because: (1) although the identity of the shareholders and the relative shareholdings differed, there was no change in corporate identity; (2) the contribution of assets to a corporation in exchange for stock does not alter the corporate identity; (3) all of the pre-"combination" assets and liabilities remained, directly or indirectly, with post-transaction DHS; (4) DHS continued to benefit from the assets transferred to SAG and to be responsible for the remaining liabilities; (5) the transaction was designed to allow the tax loss carryforward to benefit DHS after the "combination"; and (6) under German income tax law, DHS is SVK's successor company, and under that law, "a condition of eligibility for a tax loss carryforward is the 'corporation's legal and financial identity with the corporation that incurred the losses.'"

Based on these factors, this Court finds Commerce's determination that SVK is for all intents and purposes DHS is supported by substantial evidence and otherwise in accordance with law. Arguably, one could conclude that because the form of the transaction was a "combination" with another company and the subsequent transfer of all liabilities and assets except for tax loss carryforward to SAG, DHS is not the same enterprise for all intents and purposes as SVK. Form, however, is not controlling. Instead, "form is subordinate to substance." *British Steel II,* 924 F.Supp. at 157. Commerce's explanation has identified substantial evidence to support its conclusion that, substantively, DHS is SVK for countervailing duty purposes. *See Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted); *Matsushita Elec. Indus. Co. v. United States,* 3 Fed.Cir. (T) 44, 54, 750 F.2d 927, 936 (1984) ("It is not the function of a court to decide that, were it the [agency], it would have made the same decision on the basis of the evidence.").

■ The second aspect of the *Redetermination* that this Court must examine is Commerce's attribution of the subsidies received by DHS to the production of Dillinger as a subsidiary of DHS. Commerce's attribution apparently rests on: (1) its practice of treating domestic subsidies as untied; (2) its practice of attributing domestic subsidies received by non-multinational holding companies over the total sales of all subsidiaries owned or otherwise controlled by the holding company, absent evidence of tying to a particular product or market; and (3) its finding here that the benefits of the debt forgiveness were not tied to a particular product or market. Dillinger informs this Court that as Commerce "correctly notes, the parties have not challenged [Commerce's] practice that, normally, general subsidies bestowed directly on a parent company may be attributed to its subsidiaries." (Dillinger's Comments at 8.) What Dillinger does argue is that "[u]nder facts like those present in this case, the bestowal of such subsidies must have taken place while the companies were subsidiaries of the parent." (*Id.* (footnote omitted).) According to Dillinger, the subsidies were provided to SVK, a producer of long products only, and no benefits from those subsidies flowed to Dillinger.

Commerce's attribution of the subsidies received by DHS to the production of Dillinger as a subsidiary of DHS is supported

---

for structuring the transaction in this manner was to ensure that the tax loss carryforward would remain with DHS to the benefit of DHS

and both of its subsidiaries. Here form follows function.") (footnote omitted).)

by substantial evidence and is otherwise in accordance with law. The fact that SVK produced only long products does not mean in this instance that the debt forgiveness was tied to long product production. Commerce has found the debt forgiveness to constitute a precondition of the transaction at issue. This finding is supported by the facts of the transaction—a transaction in which Usinor Sacilor contributed its shares in Dillinger in exchange for a majority interest in DHS. Thus, the fact that SVK produced long products at the time of debt forgiveness is not fatal to Commerce's attribution. Accordingly, this Court sustains Commerce's attribution of the subsidies. *See Consolo,* 383 U.S. at 620.

## II. GERMAN COUNTRY-SPECIFIC ISSUES RELATING TO PRIVATIZATION

As discussed, Domestics have submitted a motion for judgment on the agency record in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD. In that motion, Domestics argue four issues, one of which is related to privatization. That argument, however, pertains to Commerce's findings in the *German Final Determination* because Domestics submitted their motion prior to any remand of the *German Final Determination* by this Court. Domestics argue Commerce incorrectly found in the *German Final Determination* that: (1) the loan forgiveness benefitted SVK and was passed through to DHS; (2) the creation of DHS was a privatization; and (3) the privatization resulted in a partial repayment of the loan forgiveness subsidy. Essentially, Domestics claim is that the subsidy was provided directly to DHS, and thus whether or not SVK was privatized is irrelevant. Commerce's findings in the *German Final Determination,* Domestics argue, contradict Commerce's findings in a related determination.

Subsequent to Domestics' filing of the motion for judgment on the agency record in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, this Court has twice remanded the *German Final Determination* on the privatization issue. This Court interprets Domestics' most recent

filing, the comments on the *Redetermination,* to embody Domestics' position on the privatization transaction at issue. As discussed, Domestics support Commerce's *Redetermination.* Thus, this Court regards Domestics' arguments pertaining to privatization in the country-specific motion for judgment on the agency record to be subsumed by Domestics' comments on the *Redetermination.* Accordingly, this Court will enter final judgment pursuant to Rule 54(b) as to counts I, II, and III in the complaint of the Domestic Producers in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD.

Dillinger also submitted a country-specific motion for judgment on the agency record in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD. In that motion, Dillinger sets forth six arguments, all of which this Court will address in order to enter final judgment as to Dillinger's complaint. The first argument concerns issue preclusion. Dillinger maintains that Commerce's original privatization methodology was found invalid by this Court in *Saarstahl* based on facts identical to those at issue, and thus *Saarstahl* is dispositive of the current case. The Court rejects Dillinger's argument. First, this Court has already denied Dillinger's motion for summary judgment based on issue preclusion in *British Steel I.* Second, the Court denies Dillinger's argument given the state of the current proceeding and of *Saarstahl.*

Dillinger's second contention is that Commerce improperly allocated the subsidies at issue over total DHS sales, including Dillinger's sales of flat-rolled steel plate products. The Court rejects this argument as well. As this Court has found above and for the reasons stated above, Commerce's allocation of the subsidies at issue is supported by substantial evidence and is otherwise in accordance with law.

■ Third, Dillinger argues Commerce's finding that abandonment of contingent repayment obligations (RZVs) constituted forgiveness of long-term, contingent-liability, interest-free loans is not supported by the record.[16] Dillinger maintains that, assuming any benefits survived privatization, Commerce should have treated the RZVs as

16. Although Dillinger's arguments predate the

*Redetermination,* Commerce's findings regarding

grants when provided. No payments ever came due on the RZVs, Dillinger argues, because the firm never returned to profitability: "Its repayment obligations remained contingent and, since the contingency never occurred, the repayment obligation never became fixed and owing." (Dillinger's Mot. for J. on Agency R. (Dillinger's Br.) at 37.) [17] If the RZVs were not grants, Dillinger continues, Commerce should consider the RZVs to be hybrid instruments under Commerce's equityworthiness methodology and classify them as equity at the time they arose. In addition, Dillinger argues, "[i]t is particularly troublesome that [Commerce] adheres to its finding that the RZVs were debt instruments, and that the abandonment of the RZVs constituted debt forgiveness in 1989 because, as a purely factual matter, the 'debt' found in this case has not been 'forgiven.'" (*Id.* at 40.) The Governments of Germany and Saarland, Dillinger argue, abandoned the RZVs because they were worthless. However, the governments could lay claim to the assets of SAG in a bankruptcy proceeding.

> In response, Commerce explains it determined that Saarstahl SVK's repayment obligations were debt instruments and that the governments' forgiveness of that debt in 1989 was a countervailable event. Commerce treated the debt forgiveness as a grant received in that year, in an amount equal to the face value of the RZVs.

(Def.'s Mem. in Resp. to Pls.' Mots. (Def.'s Resp.) at 29.) Commerce argues its classification of the RZVs or contingent repayment obligations as debt is supported by substantial evidence first because "[t]he hallmark of debt is the obligation to repay." (*Id.* at 30

(citation omitted).) Because the RZVs required repayment, Commerce argues it properly treated them as debt. Second, Commerce maintains Dillinger ignores the fundamental nature of a grant, which is, in part, the provision of funds "'without expectation of a ... payment of any kind.'" (*Id.* at 31 (citation omitted) (Commerce's emphasis deleted).) The fact that the contingency did not occur antecedent to cancellation of the RZVs, Commerce reasons, "does not change the essential character of the instruments, which were obligations to repay." (*Id.* at 32 (citation omitted).) According to Commerce, Dillinger confuses the repayment obligation with terms and conditions for repayment. Furthermore, Commerce argues, no evidence in the record suggests the governments provided the RZVs with the knowledge the firm could not meet the repayment obligations, and, "[g]iven that they did attach a repayment obligation, it was reasonable for Commerce to find that the RZVs constituted debts of the company." (*Id.* at 33.) As to Dillinger's argument that the RZVs should be classified as equity, Commerce claims: (1) Dillinger did not raise the issue below; and (2) Dillinger has erroneously read Commerce's criteria used to identify hybrid instruments as debt or equity. Finally, regarding Dillinger's argument concerning bankruptcy, Commerce responds: (1) the events giving rise to the bankruptcy occurred subsequent to the period of investigation and, therefore, are not supported by the record; and (2) the bankruptcy does not impact benefits accruing during the period of investigation.

■ This Court rejects Dillinger's arguments on this point. There is no dispute that

---

the subsidy at issue, the forgiveness of debt, are reflected in the *Redetermination:*

> In the years prior to 1989, [SVK] and its predecessor companies received massive amounts of assistance from the Governments of Germany and Saarland. Repayment of this assistance was contingent upon SVK returning to profitability....
>
> ....
>
> On June 14, 1989, the Government of Germany ... and the GOS forgave all of the outstanding debts owed to them by SVK. This debt forgiveness was a pre-condition to the combination of SVK and Dillinger. Private

creditors also forgave a portion of the debt owed to them by SVK.

*Redetermination* at 5–6 (footnote omitted). Thus, Dillinger's arguments concerning whether the abandonment of the RZVs constituted a countervailable subsidy appear currently viable.

17. Moreover, Dillinger adds, knowing they had "no realistic chance of ever being paid back" due to the firm's financial state, the Governments of Germany and Saarland continued to provide funds to the company, "and the RZVs which arose in conjunction with the disbursement of funds became little more that [sic] a legal technicality under German administrative law." (Dillinger's Br. at 38.)

the RZVs bore an obligation to repay, although the contingency triggering repayment never occurred. Commerce, in its expertise, has interpreted this evidence to conclude the repayment obligations were debt instruments and that the governments' forgiveness of that debt in 1989 was a countervailable event. Although Dillinger would prefer a different outcome, this Court cannot say Commerce's determination is not supported by substantial evidence. *See Consolo*, 383 U.S. at 620 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted).

■ Fourth, Dillinger argues that assuming the 1989 abandonment of the RZVs was a countervailable event, Commerce erred in determining that the value of the abandoned RZVs in 1989 was their "face" value. Under Commerce's proposed regulations, Dillinger explains, "forgiveness of debt" is measured as an amount equal to the outstanding principal and accrued unpaid interest at the time of forgiveness. Here, however, the RZVs had no outstanding principal or interest at abandonment. Furthermore, even if the RZVs are considered a "forgiven loan," under Commerce's allocation rules the "forgiven" amount is still zero in 1989. Valuation of the RZVs as zero is also supported by German accepted accounting principles, Dillinger argues. Outside independent auditors evaluating the proper value to be placed on the abandonment of the contingency found the value to be zero. Dillinger maintains only an abandonment of a contingent repayment obligation occurred, not a forgiveness of actual liability. Furthermore, as Commerce has determined, Dillinger argues it received no benefit from its affiliation with SAG.

Commerce responds that face value represents the "principal" amount of a loan, and that "[a] contingent repayment obligation does not alter the total outstanding liability, ... it is the elimination of that liability which gives rise to the countervailable benefit." (Def.'s Resp. at 41.) Thus, Commerce explains, "it is Commerce's practice to measure the benefit from debt forgiveness based on the face value of the debt, even when there is a contingent obligation to repay." (*Id.* (citations and footnote omitted).) In this case,

Commerce reasons, the unencumbering of future profits was a benefit equal to the amount of the liability that was extinguished.

This Court rejects Dillinger's argument on this point. Commerce's treatment of the debt forgiveness as a grant received in that year in an amount equal to the face value of the RZVs is based on a sustainable interpretation of its proposed regulation. *Cf. Asociacion Colombiana de Exportadores de Flores v. United States*, 8 Fed.Cir. (T) 126, 131, 903 F.2d 1555, 1559 (1990) ("The [agency's] interpretation of its own regulations implementing the statutes it administers is entitled to substantial weight.") (citation and internal quotations omitted).

Fifth, Dillinger argues Commerce failed to apply properly its privatization methodology in the *German Final Determination*, in that Commerce incorrectly calculated the amount of subsidies "repaid" pursuant to its repayment methodology. Given this Court's decisions on the privatization issue and the present opinion, this argument is moot.

■ Finally, Dillinger argues Commerce erred in finding forgiveness of principal and interest by private banks constituted a countervailable subsidy. Commerce's practice, Dillinger argues, "is to find subsidies by private entities to be countervailable only when they are required by or at the direction of the government." (Dillinger's Br. at 50 (citations omitted).) Here, Dillinger contends, no evidence exists on the record to support a conclusion that the banks' action was required or directed by the Governments of Germany and Saarland: "While it was a requirement that the banks cooperate in order for the Governments' plan to succeed, there was nothing that compelled that cooperation, or would have compelled that cooperation had the banks decided that another course of action was in their commercial best interests." (*Id.* at 52.) Dillinger claims, furthermore, that it is Commerce's practice to presume commercial institutions behave in a commercial manner, absent contrary evidence. Additionally, Dillinger argues the Governments' guaranteeing of the future liquidity does not alter their argument: "[W]ith respect to the *forgiven* debt, the assurance ... was simply another commercial consideration that the banks would take into account in deciding whether or not par-

ticipation in the plan ... was in their best interests." (*Id.* at 54.) "[A]ny possible benefit to the company as a result of guarantees of future liquidity would apply only to the remaining, and not the forgiven, bank debt." (*Id.* at 56.) Dillinger also contends Commerce has engaged in impermissible burden shifting to the extent Commerce gave as a reason supporting its finding " 'the absence of any documentation to support respondent's claim that the banks' actions were commercially sound.' " (*Id.* at 54 (quoting *German Final Determination,* 58 Fed.Reg. at 6236).)

Commerce responds that "based on the evidence of the governments' significant role in the private banks' debt forgiveness, Commerce determined that the debt forgiveness was a benefit provided, indirectly, by the governments and, therefore, countervailable." (Def.'s Resp. at 43 (citation omitted).) In so doing, Commerce argues two points. First, Commerce contends its long-standing practice is to find a benefit "provided or required" by government action under 19 U.S.C. § 1677(5) (1988) when a government "plays a significant role in bringing about the benefit." (*Id.* at 43–44 (footnote omitted).) That which constitutes a significant government role, Commerce argues, is not limited to explicit government direction. Commerce further argues Dillinger's interpretation of the statute would give meaning only to the word "required," thus violating the rule of statutory construction that significance and effect be accorded every word in a statute if possible. Second, Commerce contends the record supports its determination. Commerce explains its "determination was based upon the fact that the governments designed a plan in which the banks' debt forgiveness was necessary in order for the plan to succeed, and the governments provided the necessary incentive (*e.g.,* the liquidity guarantee) to secure the banks' cooperation." (*Id.* at 46 (footnote omitted).) Regarding the guarantee of future liquidity, Commerce explains the banks were willing to forgive a portion of the debt only if the governments guaranteed the future liquidity of the company: "The governments' liquidity guarantee was more than a 'consideration'; it was a necessary *condition* for the banks' debt forgiveness." (*Id.* at 47 (citation omitted).)

This Court rejects Dillinger's arguments. Commerce's determination is based upon a permissible construction of the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.") (footnote omitted); *see also British Steel I,* 879 F.Supp. at 1263 ("The Court must accord substantial weight to the agency's interpretation of the statute it administers.") (*citing American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (further citations omitted)). Additionally, although Dillinger would interpret the evidence differently, Commerce has advanced substantial evidence to support its conclusion. *See Consolo,* 383 U.S. at 620, 86 S.Ct. at 1026–27.

Based on the Court's discussion above, the Court enters final judgment as to Dillinger's complaint filed under *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD, one of the actions consolidated in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD.

### CONCLUSION

After considering Commerce's *Redetermination* and the arguments of all parties thereon, and the arguments of all parties regarding the country-specific privatization issues discussed herein, this Court holds: (1) Commerce's *Redetermination* is supported by substantial evidence and is otherwise in accordance with law; (2) Domestics' arguments on the issue of privatization in their country-specific motion for judgment on the agency record filed in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, are subsumed by Domestics' comments on the *Redetermination;* (3) regarding Dillinger's arguments in its country-specific motion for judgment on the agency record filed in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, (a) the Court finds Dillinger's argument concerning the application of the privatization methodology in the *German Final Determination* is moot, and (b) the Court rejects the remainder of Dillinger's argu-

ments; (4) the Court will enter final judgment pursuant to Rule 54(b) in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, consisting of *LTV Steel Co., Inc.,* et al. *v. United States,* Court No. 93–09–00568–CVD, *Thyssen Stahl AG,* et al. *v. United States,* Court No. 93–09–00585–CVD, *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD, and *Fried. Krupp AG Hoesch–Krupp and Krupp Hoesch Stahl AG v. United States,* Court No. 93–09–00603–CVD, as to (a) counts I, II, and III in the complaint of the Domestic Producers who filed a complaint in *LTV Steel Co., Inc. v. United States,* Court No. 93–09–00568–CVD, and (b) the complaint of Dillinger filed under *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD.

This matter having been submitted for decision, after due deliberation it is hereby

ORDERED that Commerce's second remand determination on the issue of privatization as it pertains to *Certain Steel Products from Germany,* 58 Fed.Reg. 37,315 (Dep't Comm.1993) (final determ.) (*German Final Determination*) is sustained; and it is further

ORDERED that Domestics' arguments on the issue of privatization in their country-specific motion for judgment on the agency record filed in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, are subsumed by Domestics' comments on the *Redetermination;* and it is further

ORDERED that regarding Dillinger's arguments in its country-specific motion for judgment on the agency record filed under *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, (a) the Court finds Dillinger's argument concerning the application of the privatization methodology in the *German Final Determination* is moot, and (b) the Court rejects the remainder of Dillinger's arguments; and it is further

ORDERED that final judgment is entered pursuant to Rule 54(b) in *LTV Steel Co., Inc.,* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, consisting of *LTV Steel Co., Inc.,* et al. *v. United States,* Court No. 93–09–00568–CVD, *Thyssen Stahl AG,* et al. *v.*

*United States,* Court No. 93–09–00585–CVD, *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD, and *Fried. Krupp AG Hoesch–Krupp and Krupp Hoesch Stahl AG v. United States,* Court No. 93–09–00603–CVD, as to (a) counts I, II, and III in the complaint of the Domestic Producers who filed a complaint in *LTV Steel Co., Inc. v. United States,* Court No. 93–09–00568–CVD, and (b) the complaint of Dillinger filed under *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD.