174 F.3d 1359
 LTV STEEL CO., INC., AK Steel Corp., Bethlehem Steel
Corporation, Inland Steel Industries, Inc.,
National Steel Corporation, and U.S.
Steel Group-a Unit of USX
Corporation,
Plaintiffs-Appellees,
and
Geneva Steel, Gulf States Steel, Inc. of Alabama, Laclede
Steel Company, Lukens Steel Company, Sharon Steel
Corporation, and WCI Steel, Inc., Plaintiffs,
v.
UNITED STATES, Defendant/Cross-Appellant,
v.
Thyssen Stahl AG, Thyssen Detroit Steel Co., and Thyssen,
Inc., Defendants,
and
AG Der Dillinger Huttenwerke, Defendant-Appellant.
 Nos. 97-1082, 97-1165.
 United States Court of Appeals,
Federal Circuit.
 April 12, 1999.
 
 John A. Ragosta, Dewey Ballantine LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were John R. Magnus and Dominic L. Bianchi. Of counsel were Michael H. Stein, Guy Charles Smith, John R. Magnus, Michael R. Geroe, and Kristen M. Neller. Also of counsel on the brief were John J. Mangan and Stephen J. Narkin, Skadden, Arps, Slate, Meagher & Flom, of Washington, DC.
 A. David Lafer, Senior Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant/cross-appellant. With him on the brief were David M. Cohen, Director, and Thomas A. Coulter, Trial Attorney. Of counsel on the brief were Stephen J. Powell, Chief Counsel; John D. McInerney and Elizabeth C. Seastrum, Senior Counsel; and Myles S. Getlan, Attorney-Advisor, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.
 Pierre F. de Ravel d'Esclapon, LeBoeuf, Lamb, Greene & MacRae, L.L.P., of Washington, DC, argued for defendant-appellant. With him on the brief was William C. Sjoberg. Of counsel was Mary P. Michel.
 J. Kevin Horgan, deKieffer & Horgan, of Washington, DC, for amicus curiae Saarstahl AG. With him on the brief was Marc E. Montalbine. Of counsel was Kara K. Pate.
 Before MAYER, Chief Judge, SKELTON, Senior Circuit Judge, and PLAGER, Circuit Judge.
 Opinion for the court filed by Chief Judge MAYER. Circuit Judge PLAGER concurs in the result.
 MAYER, Chief Judge.
 
 
 1
 AG der Dillinger Huttenwerke ("Dillinger") and the United States appeal the judgment of the Court of International Trade, Court No. 93-09-00568, British Steel plc v. United States, 936 F.Supp. 1053 (Ct. Int'l Trade 1996) ("British Steel IV "), affirming the final determination of the United States Department of Commerce ("Commerce") in Certain Steel Products from Germany, 58 Fed.Reg. 37,315 (Dep't Comm. July 9, 1993) ("Final Steel Products "), as modified on remand in Final Results of Redetermination Pursuant to Court Remand on Certain Factual Issues Regarding the Privatization in Germany (May 22, 1996) ("Redetermination II ") and Final Results of Redetermination Pursuant to Court Remand on General Issues of Privatization (Jul. 17, 1995) ("Redetermination I "). They also appeal interim decisions, British Steel plc v. United States, 924 F.Supp. 139 (Ct. Int'l Trade 1996) ("British Steel II "), and British Steel plc v. United States, 879 F.Supp. 1254 (Ct. Int'l Trade 1995) ("British Steel I "). We affirm in part, reverse in part, and remand.
 
 Background
 
 2
 Between 1978 and 1985, Saarstahl Volklingen GmbH ("SVK") received subsidies from the governments of Germany ("Germany") and Saarland ("Saarland"), all of which contained a repayment obligation, known as RZV, which arose if SVK turned a profit. During this period, Arbed Luxembourg owned SVK, but, in 1985, considered closing operations. As a result of SVK's importance to the region, Saarland and Germany sought another owner and, in 1986, became majority owners to facilitate this end. See British Steel IV, 936 F.Supp. at 1059; Certain Hot Rolled Lead and Bismuth Carbon Steel Prods. from Germany, 58 Fed.Reg. 6233, 6234 (Dep't Comm. Jan. 27, 1993) (final affirm. determ.) ("Final Lead Bar "). Usinor-Sacilor, which owned Dillinger, expressed interest in acquiring SVK, but only if its debt burden were alleviated. In 1989, Saarland brokered a deal to privatize SVK in which it and Germany forgave the RZVs and several private banks forgave portions of their loans. The private banks conditioned their forgiveness on the governments' abandonment of the RZVs and Saarland's promise to assure the future liquidity of the new entity. See British Steel IV, 936 F.Supp. at 1059; Final Lead Bar, 58 Fed.Reg. at 6234-35. SVK became Dillinger Hutte Saarstahl AG ("DHS"), which could issue stock, and Usinor-Sacilor transferred Dillinger to DHS in return for an ownership interest. DHS then transferred the lead bar assets, except for SVK's tax loss carryforward, to a newly formed subsidiary, Saarstahl AG ("Saarstahl"). Dillinger became a second subsidiary of DHS and retained its steel plate assets. See British Steel IV, 936 F.Supp. at 1059-60; Redetermination II at 5-8.
 
 
 3
 In 1992, Commerce initiated separate countervailing duty investigations of Dillinger and Saarstahl. See Final Steel Products, 58 Fed.Reg. at 37,315 (Dillinger); Final Lead Bar, 58 Fed.Reg. at 6233 (Saarstahl). On July 9, 1993, Commerce published its methodology for measuring subsidies that survive a privatization transaction. See General Issues Appendix, 58 Fed.Reg. 37,225, 37,259-73 (Dep't Comm. July 9, 1993). Commerce maintained that subsidies travel to a private or privatized company unless they are repaid, and announced methodologies for determining the amount of repayment. See id. Following these methodologies, Commerce determined that the governments' RZV forgiveness was a subsidy benefiting SVK, which passed through to DHS during privatization to the extent the purchase price did not repay it. See Final Steel Products, 58 Fed.Reg. at 37,320; see also General Issues Appendix, 58 Fed.Reg. at 37,271-72. Commerce treated the amount of the debt forgiveness as a non-recurring grant and calculated the benefit stream according to the grant methodologies of the General Issues Appendix, 58 Fed.Reg. at 37,226-31. See Final Lead Bar, 58 Fed.Reg. at 6234; see also Final Steel Products, 58 Fed.Reg. at 37,320. It valued this forgiveness at the amount of the outstanding debt, i.e., the RZVs' "face-value," instead of their economic value, which Dillinger maintained was zero. See Final Steel Products, 58 Fed.Reg. at 37,320; Final Lead Bar, 58 Fed.Reg. at 6234. In addition to this subsidy, Commerce determined that the debt forgiveness by private banks constituted a countervailable subsidy because "it was required by the governments as part of a government-led debt reduction package, and because the two governments guaranteed the future liquidity of [the company]." Final Steel Products, 58 Fed.Reg. at 37,320; see also Final Lead Bar, 58 Fed.Reg. at 6235. Commerce assessed countervailing duties against Dillinger's products to offset the subsidies attributable to DHS because Dillinger was a DHS subsidiary. See General Issues Appendix, 58 Fed.Reg. at 37,271-72.
 
 
 4
 In June 1994, in connection with the appeal of the determination made in the Saarstahl investigation, the Court of International Trade held that Commerce's privatization methodology was unlawful and developed a new one. See Saarstahl AG v. United States, 858 F.Supp. 187, 192-94 (Ct. Int'l Trade 1994) ("Saarstahl I "), rev'd, 78 F.3d 1539 (Fed.Cir.1996). The court then remanded the Dillinger case for Commerce to apply this new methodology. See British Steel I, 879 F.Supp. at 1287. On remand, Commerce found that none of the subsidies were repaid because DHS was for all intents and purposes the same entity as SVK. See Redetermination I at 20-24. Commerce did not revisit the other issues.
 
 
 5
 Thereafter, we issued Saarstahl AG v. United States, 78 F.3d 1539 (Fed.Cir.1996) ("Saarstahl II "). In response, the Court of International Trade again remanded the Dillinger case to Commerce, maintaining, based on British Steel II, 924 F.Supp. at 155-58, that our decision did not affect the viability of its new methodology. On remand, Commerce continued to find that the debt forgiveness by Germany, Saarland, and the private banks constituted a countervailable subsidy because it "was specific to an enterprise and bestowed a benefit." Redetermination II at 9. It again found that DHS was for all intents and purposes the same entity as SVK and that none of the subsidies were repaid. See id. at 10-13. It also explained that because DHS was a holding company and the subsidies were not tied to any specific product, it could countervail the products of DHS's subsidiaries. Therefore, Commerce imposed countervailing duties on Dillinger's products. See id. at 14-18.
 
 
 6
 The Court of International Trade sustained Commerce's application of the court's privatization methodology. See British Steel IV, 936 F.Supp. at 1067-68. The court also found that substantial evidence supports Commerce's determination that the abandonment of the RZVs in 1989 was a countervailable event in the form of debt forgiveness because the RZVs bore a repayment obligation, which is the hallmark of debt. See id. at 1069-70. The court sustained, as a reasonable interpretation of the proposed regulation, Commerce's valuation of the subsidy bestowed by this debt forgiveness, noting that "the unencumbering of future profits was a benefit equal to the amount of the liability that was extinguished," which is the RZVs' face-value. Id. at 1070. Finally, the court sustained Commerce's characterization of the private banks' debt forgiveness as a subsidy bestowed through government action because it is "based upon a permissible construction of the statute." Id. at 1071. The United States and Dillinger appeal.
 
 Discussion
 
 7
 "In reviewing a decision by the Court of International Trade to affirm the agency's final determination, we apply anew the court's statutorily-mandated standard of review to the administrative review." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369 (Fed.Cir.1998) (internal quotations omitted). Therefore, we must overturn Redetermination II if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "When Congress' intent is unclear, courts must sustain an agency's interpretation of a statute if it falls within the range of permissible construction. To sustain an agency's application of a statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Inland Steel Bar Co. v. United States, 155 F.3d 1370, 1374 (Fed.Cir.1998) (internal quotations and citations omitted).
 
 
 8
 "[N]either the statute nor the legislative history offers guidance to Commerce in determining the amount of a prior subsidy, if any, that is repaid through the purchase price of a privatization." British Steel PLC v. United States, 127 F.3d 1471, 1475 (Fed.Cir.1997) ("British Steel V "). We have thrice held, however, that "with respect to this issue, Commerce's interpretation of the countervailing duty statute--namely, the repayment methodology in the General Issues Appendix, 58 Fed.Reg. at 37,259-73--is reasonable." Inland Steel, 155 F.3d at 1374; see also British Steel V, 127 F.3d at 1475; Saarstahl II, 78 F.3d at 1544.
 
 
 9
 "In British Steel I, the Court of International Trade did not give proper deference to Commerce's repayment methodology ... [and] imposed its own interpretation of the statute [on Commerce] by formulating an alternative test." British Steel V, 127 F.3d at 1475. As a result, it erred in sustaining Commerce's application of this alternative test in British Steel IV. Therefore, we must reverse the Court of International Trade's judgment and remand the case so that the court may determine whether Commerce accurately applied its repayment methodology in Final Steel Products.
 
 
 10
 Dillinger has raised other challenges to the Court of International Trade's decision to sustain Commerce's determination that (1) the private banks' debt forgiveness bestowed a subsidy, (2) the RZVs were interest-free, contingent liability loans, the forgiveness of which bestowed a subsidy equaling their face-value, and (3) both these subsidies were untied. We have considered the arguments of all the parties and affirm on the basis of the Court of International Trade's opinion.
 
 Conclusion
 
 11
 Accordingly, the judgment of the Court of International Trade is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.
 
 
 12
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 13
 PLAGER, Circuit Judge, concurs in the result.