**DELVERDE, SRL and Delverde USA, Inc., Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

v.

**Borden, Inc., Hershey Foods Corp. and Gooch Foods, Inc., Defendants–Appellees.**

**No. 99–1186.**

United States Court of Appeals, Federal Circuit.

Feb. 2, 2000.

Lawrence J. Bogard, Neville, Peterson & Williams, Washington, DC, argued for plaintiffs-appellants. Of counsel on the brief was Constantino P. Suriano, Mound, Cotton & Wollan, New York, NY.

A. David Lafer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee, United States. With him on the brief were David W. Ogden, Acting Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel; Elizabeth C. Seastrum, Senior Counsel, and Terrence J. McCartin, Senior Counsel, Office of Chief Counsel for

Import Administration, Department of Commerce, Washington, DC.

Lynn Duffy Maloney, Collier, Shannon, Rill & Scott, PLLC, Washington, DC, argued for defendants-appellees, Borden, Inc., et al. On the brief were Paul C. Rosenthal, Kathleen Weaver Cannon, and John M. Herrmann.

John A. Ragosta, Dewey Ballantine LLP, Washington, DC, for amici curiae Bethlehem Steel Corp., et al. With him on the brief were John R. Magnus, and Dominic L. Bianchi. Of counsel on the brief were John J. Mangan, and Stephen Narkin, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC.

Sheldon E. Hochberg, Steptoe & Johnson LLP, Washington, DC, for amicus curiae, British Steel Engineering Steels Limited. With him on the brief were Richard O. Cunningham and Peter Lichtenbaum.

Before LOURIE, CLEVENGER, and GAJARSA, Circuit Judges.

LOURIE, Circuit Judge.

Delverde, SrL ("Delverde") and Delverde USA, Inc. appeal from the September 25, 1998 decision of the United States Court of International Trade affirming the Department of Commerce's ("Commerce's") countervailing duty determination. *See Delverde, SrL v. United States*, 24 F.Supp.2d 314 (Ct. Int'l Trade 1998) ("*Delverde II* "). Because Commerce's methodology for determining whether Delverde indirectly received countervailable subsidies from the Italian government is inconsistent with § 771(5) of the Tariff Act of 1930, 19 U.S.C. § 1677(5) (1994) ("Tariff Act"), as amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, § 251(a), 1994 U.S.C.C.A.N. (108 Stat.) 4809, 4902–03 ("URAA"), we vacate and remand.

## BACKGROUND

In 1995, Commerce launched a countervailing duty investigation of certain non-egg dry pasta in packages of five pounds or less imported in 1994 from Italy. *See Notice of Initiation of Countervailing Duty Investigations: Certain Pasta From Italy and Turk.*, 60 Fed.Reg. 30,280 (1995). Upon investigation of 17 Italian manufacturer-importers, Commerce discovered that, in 1991, Delverde purchased certain corporate assets, namely, a pasta factory and related production assets, name, and trademark, from a private company that had previously received several nonrecurring countervailable subsidies from the Italian government from 1983 to 1991. *See Final Affirmative Countervailing Duty Determination: Certain Pasta From Italy*, 61 Fed.Reg. 30,288, 30,289 (1996) ("*Pasta From Italy* "); *Delverde, SrL v. United States*, 989 F.Supp. 218, 226 (Ct. Int'l Trade 1997) ("*Delverde I* ").[1] Despite evidence that an independent accountant determined that Delverde paid fair market value for those assets in an arm's length transaction, *see Delverde I*, 989 F.Supp. at 227, Commerce applied the spin-off methodology described in the Restructuring section of the General Issues Appendix to *Final Affirmative Countervailing Duty Determination: Certain Steel Prods. From Aus.*, 58 Fed.Reg. 37,-217, 37,268–69 (1993) ("*Steel From Aus.*"), and levied countervailing duties against Delverde for the 1994 year. *See id.*; *Pasta From Italy*, 61 Fed.Reg. at 30,292–94.

The methodology employed by Commerce is explained in detail in *Inland Steel Bar Co. v. United States*, 155 F.3d 1370 (Fed.Cir.1998), and is summarized as follows: First, when Commerce determines that a company has received a nonrecurring subsidy, Commerce divides the amount of that subsidy by the number of years equal to "the average useful life of renewable physical assets in the industry

---

**1.** The subsidies that Commerce determined to be nonrecurring and countervailable were an "Industrial Development Grant under Law 64/86" and an "Export Marketing Grant under Law 304/90." *See* 61 Fed.Reg. at 30,292–94.

concerned" and allocates an amount to each year accordingly. *See* 19 C.F.R. § 351.524 (1999). Second, Commerce assumes that when a company sells "productive assets" during "the average useful life," a pro rata portion of that subsidy "passes through" to the purchaser at the time of the sale. *See Steel From Aus.,* 58 Fed.Reg. at 37,268–69. Commerce then quantifies the assumed "pass through" amount, makes adjustments based on the purchase price, allocates an amount to the year of investigation, and calculates the *ad valorum* subsidy rate. *See id.* at 37,268– 69. In Delverde's case, Commerce determined that the average useful life of renewable physical assets in the food processing industry was 12 years. *See Pasta From Italy,* 61 Fed.Reg. at 30,289. Commerce thus held Delverde responsible for a pro rata portion of the nonrecurring subsidies that were granted to the former owner between 1983 and 1991 because they fell within that 12–year period. *See id.* at 30,288.

Delverde and Delverde USA, Inc. sued in the Court of International Trade, arguing that the Commerce's methodology, *viz,* its assumption that a pro rata portion of the former owner's nonrecurring subsidies "passed through" to Delverde as a consequence of the sale, was erroneous and inconsistent with the Tariff Act as amended by the URAA. Initially, the court agreed with the appellants and remanded the case, instructing Commerce to look at the terms of the sale to determine whether Delverde can be considered to have indirectly received the former owner's subsidies. *See Delverde I,* 989 F.Supp. at 234. After Commerce explained its methodology in more detail and further argued its reasonableness on remand, the court affirmed. *See Delverde II,* 24 F.Supp.2d at 315.

Delverde timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## DISCUSSION

■ We review the Court of International Trade's decision to affirm Commerce's final determination by applying anew that court's statutorily mandated standard of review. *See LTV Steel Co. v. United States,* 174 F.3d 1359, 1362 (Fed. Cir.1999). Therefore, we may hold unlawful Commerce's final determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

■ In reviewing the validity of an agency's interpretation of a statute that it is charged with administering, "we must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States,* 157 F.3d 879, 881 (Fed.Cir. 1998); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694. (1984). We do so by employing the traditional tools of statutory construction; we examine the statute's text, structure, and legislative history, and apply the relevant canons of interpretation. *See Timex,* 157 F.3d at 882. If we "ascertain[ ] that Congress had an intention on the precise question at issue, that intention is the law and must be given effect," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778, and the only issue is whether the agency acted in accordance with that intent, *see id.* at 842, 104 S.Ct. 2778; *Timex,* 157 F.3d at 882. If, however, we conclude that Congress either had no intent on the matter, or that Congress's purpose and intent is unclear, we defer to the agency's interpretation of the statute if it falls within the range of permissible construction. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *LTV,* 174 F.3d at 1363.

Appellants argue that Commerce's assumption that the nonrecurring subsidies received by the former owner of Delverde's corporate assets "passed through" to it, merely because it bought those assets within 12 years of the former owner's receipt of those subsidies, is contrary to law and without any basis in fact. First,

appellants argue that 19 U.S.C. § 1677(5)(B) requires that Commerce determine that the Italian government provided Delverde, not the prior owner of its assets, with a "financial contribution" and "benefit" before concluding that Delverde received a countervailable subsidy. Second, they argue that the Change of Ownership provision, 19 U.S.C. § 1677(5)(F), also prohibits Commerce from using a methodology that makes such an assumption and instead requires Commerce to look at the facts and circumstances of the sale. Third, appellants argue that the facts and circumstances in this case plainly show that Delverde bought its assets at fair market value, and that Commerce has produced no evidence that Delverde received either a financial contribution or a benefit, directly or indirectly, by buying the assets from a subsidized seller. They point out that the Tariff Act defines "benefit" to include goods "provided for less than adequate remuneration," 19 U.S.C. § 1677(5)(E)(iv) (1994), and that Commerce has no evidence that the price it paid for the assets was "inadequate." Fourth, they argue that this court's decisions in *Saarstahl AG v. United States*, 78 F.3d 1539 (Fed.Cir.1996) ("*Saarstahl II*"), *British Steel PLC v. United States*, 127 F.3d 1471 (Fed.Cir.1997), and *Inland Steel* do not require a different result because those decisions only addressed the reasonableness of Commerce's methodology in a privatization context and under the Tariff Act before it was amended to include the current provisions. Lastly, appellants point out that it is well established that the countervailing duty laws are supposed to be remedial rather than punitive, and that there is no evidence that Delverde is circumventing the law or otherwise escaping payment of duties by exploiting a loophole in the law.

Appellees respond that Commerce's methodology is consistent with the Tariff Act as amended by the URAA. First, appellees argue that the Tariff Act's new definition of "subsidy" does not require Commerce to reevaluate whether a subsidy still exists following a change of ownership because the "benefit" requirement is not new and it has been Commerce's longstanding practice to determine whether a "benefit" exists only at the time the subsidy was bestowed and to ignore all subsequent events as irrelevant. According to appellees, a change of ownership is one such subsequent event that is irrelevant in determining the existence of a "benefit" and therefore the fact that Delverde bought the assets at fair market value is also irrelevant. Second, appellees argue that the Change of Ownership provision left the choice of methodology to Commerce. Appellees submit that Commerce did consider the facts of the case but only considered the change of ownership to be relevant to quantifying the amount of the subsidy that Delverde received. Lastly, appellees argue that whether Delverde received a benefit from the former owner's subsidies only relates to the use and effect of those subsidies on Delverde, and that *Saarstahl II* and *British Steel* held that Commerce need not show a "competitive benefit" to the purchaser following a change of ownership.

■ The jumble of administrative actions, court decisions, and statutory amendments involved here does not make this case one of easy resolution. However, we have come to the conclusion that the Tariff Act as amended does not allow Commerce to presume conclusively that the subsidies granted to the former owner of Delverde's corporate assets automatically "passed through" to Delverde following the sale. Rather, the Tariff Act requires that Commerce make such a determination by examining the particular facts and circumstances of the sale and determining whether Delverde directly or indirectly received both a financial contribution and benefit from a government.

■ The first step in sorting out this puzzle is to look to the statute, and in construing a statute, we begin with its language. *See Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998). We must try to read the statute as a whole, to give

effect to all of its parts, and to avoid, if possible, rendering language superfluous. *See id.; Takoma, Washington v. Richardson,* 163 F.3d 1337, 1341 (Fed.Cir.1998).

The Tariff Act provides that before Commerce imposes a countervailing duty on merchandise imported into the United States, it must determine that a government is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise. *See* 19 U.S.C. § 1671(a)(1) (1994). "Except as provided in paragraph (5B), a countervailable subsidy is a subsidy described in [paragraph (5)(B)] which is specific as described in paragraph (5A)." *See id.* §§ 1677(5)(A). Paragraph (5)(B) provides the following "description" of a subsidy:

(B) Subsidy described

A subsidy is described in this paragraph in the case in which an *authority—*

(i) provides a *financial contribution,*

(ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or

(iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments

*to a person* and a *benefit* is thereby conferred. For purposes of this paragraph ..., the term *"authority"* means a *government* of a country or any public entity within the territory of the country.

*Id.* § 1677(5)(B) (emphasis added). The language of the statute is clear. In order to conclude that a "person" received a subsidy, Commerce must determine that a

government provided that person with both a "financial contribution" (or equivalent as described in §§ 1677(5)(B)(ii) and (iii)) and a "benefit." [2]

The statute is also clear as to how Commerce is to determine whether a person received a "financial contribution" or a "benefit," because it defines those terms:

(D) Financial contribution

The term "financial contribution" means—

(i) the *direct transfer of funds,* such as *grants,* loans, and equity infusion, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii) foregoing or not collecting revenues that is otherwise due, such as granting tax credits or deductions from taxable income,

(iii) *providing goods* or services, other than general infrastructure, or

(iv) purchasing goods.

(E) Benefit conferred

A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—

(i) in the case of equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,

(ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on a market,

(iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the

2. The legislative history of the URAA confirms this interpretation. *See* S.Rep. No. 103–412, at 90 (1994) ("A countervailable subsidy is one that meets the two conditions in section [1677(5)(B)], as revised ('financial contribution' and 'benefit conferred') ....").

recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

    (iv) *in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration,* and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

*Id.* §§ 1677(5)(D) and (E) (emphasis added). The Act also states that "[t]he determination of whether a subsidy exists shall be made ... without regard to whether the subsidy is provided *directly* or *indirectly* on the manufacture, production, or export of merchandise. The administering authority is not required to consider the effect of the subsidy in determining whether a subsidy exists...." *Id.* § 1677(5)(C) (emphasis added). Reading these subsections of paragraph 5 together, the statute clearly requires that in order to find that a person received a subsidy, Commerce determine that that person received from a government both a financial contribution and benefit, either directly or indirectly, by means of one of the acts enumerated.

Paragraph 5 also includes a specific provision addressing subsidies in a change of ownership situation. That provision reads as follows:

    (F) Change of Ownership

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not *by itself require* a determination by an administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change of ownership is accomplished through an arm's length transaction.

*Id.* § 1677(5)(F) (emphasis added). This provision clearly states that a subsidy cannot be concluded to have been extinguished solely by an arm's length change

of ownership. However, it is also clear that Congress did not intend the opposite, that a change in ownership *always* requires a determination that a past countervailable subsidy continues to be countervailable, regardless whether the change of ownership is accomplished through an arm's length transaction or not. If that had been Congress's intent, the statute would have so stated. Rather, the Change of Ownership provision simply prohibits a *per se* rule either way. Furthermore, this provision does not direct Commerce to use any particular methodology for determining the existence of a subsidy in a change of ownership situation. Reading this provision together with the previous subsections' clear directions for determining the existence of a subsidy, we conclude that the statute does not contemplate any exception to the requirement that Commerce determine that a government provided both a financial contribution and benefit to a person, either directly or indirectly, by one of the acts enumerated, before charging it with receipt of a subsidy, even when that person bought corporate assets from another person who was previously subsidized. In other words, the Change of Ownership provision does not change the meaning of "subsidy." A subsidy can only be determined by finding that a person received a "financial contribution" and a "benefit" by one of the acts enumerated in §§ 1677(5)(D) and (E).

The legislative history of the URAA further supports our interpretation. Regarding the new Change of Ownership provision, the House Report states:

*Section [1677(5)(F)] is being added to the Act to clarify that the sale of a firm at arm's-length does not automatically, and in all cases, extinguish any prior subsidies conferred. Absent this clarification, some might argue that all that would be required to eliminate any countervailing duty liability would be to sell subsidized productive assets to an unrelated party.* Consequently, it is imperative that the implementing bill cor-

rect and prevent such an extreme interpretation.

The issue of the privatization of a state-owned firm can be extremely complex and multifaceted. While it is the Committee's intent that Commerce retain the discretion to determine whether, and to what extent, the privatization of a government-owned firm eliminates any previously conferred countervailable subsidies, *Commerce must exercise this discretion carefully through its consideration of the facts of each case and its determination of the appropriate methodology to be applied.*

H.R.Rep. No. 103–826(I), at 110 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3882 (emphasis added). The Senate Report is nearly identical. *See* S.Rep. No. 103–412, at 92 (1994). It is clear from these statements that Congress recognized the complexity of the question whether subsidies can continue to be countervailed following a change of ownership, and added the Change of Ownership provision to emphasize that a subsidy cannot be assumed to have been extinguished following a change of ownership. The complexity of the issue stems from the fact that Commerce must find that the purchaser *indirectly* received subsidies from a government. The legislative history thus further supports our reading of the statute as plainly requiring Commerce to make a determination that a purchaser of corporate assets received both a financial contribution and benefit from a government, albeit indirectly through the seller, before concluding that the purchaser was subsidized.[3]

Having determined that the meaning of the statute is clear, we need not give *Chevron* deference to Commerce's interpretation; we need only determine whether Commerce's methodology is in accordance with the statute. We have concluded that it is not. Nowhere following its methodology did Commerce determine whether Delverde directly or indirectly received a financial contribution and benefit from one of the acts enumerated. Rather, Commerce's methodology conclusively presumed that Delverde received a subsidy from the Italian government—*i.e.,* a financial contribution and a benefit, simply because it bought assets from another person who earlier received subsidies. Commerce deemed the fact that Delverde bought the assets, as agreed to by both parties, at fair market value to be *irrelevant* to the determination whether it received a subsidy. It did not consider *any* of the facts or circumstances of the sale relevant. Commerce produced no evidence that Delverde received goods for less than "adequate remuneration." *See* 19 C.F.R. § 351.511(a)(2) (1999). As such, Commerce has adopted a *per se* rule that a person receives a subsidy in these circumstances and has failed to make the specific findings of financial contribution and a benefit to Delverde that are required by §§ 1677(5)(D) and (E). That conclusion is in direct conflict with the language of the statute.

Although Commerce characterizes a change of ownership as an issue of "subsequent events" or "effects" that it can disregard, we disagree. A change of ownership is neither. First, the fact that Congress added the Change of Ownership provision to the statute refutes such assertions of irrelevance. As we stated earlier, that provision prohibits a *per se* rule for determining whether a subsidy continues to be countervailable to a new owner following a change of ownership. As such, the statute clearly contemplates its possible relevance and contemplates that under some circumstances the purchaser will not be deemed to have received a subsidy.

---

3. Both parties tell us that the Change of Ownership provision was intended to overrule the decision of the Court of International Trade in *Saarstahl AG v. United States,* 858 F.Supp. 187 (Ct. Int'l Trade 1994) ("*Saarstahl I*"). However, neither party cites any legislative history for that proposition, and the legislative history does not so indicate. There thus does not appear to be any reliable basis for discussing that case's connection to the current statute.

Secondly, a change of ownership cannot be considered a "subsequent event" because the asset sale was the first and only event that could possibly trigger Delverde's liability for subsidies received by the former owner. Although the asset sale was an event subsequent to the former owner's receipt of subsidies, Delverde, not the former owner, is being charged with receiving subsidies here. It is not a subsequent event for Delverde.

Lastly, an "effect" of a subsidy may be a competitive advantage that the subsidy recipient obtained from the subsidies. *See Saarstahl II*, 78 F.3d at 1543. A subsidy may enable a recipient to manufacture and sell products at lower price due to the subsidies it received. *See* 19 C.F.R. § 351.503(c) (1999). The issue here, however, is not whether Delverde was able to produce and sell pasta products at lower price, but whether it received a subsidy in the first place. It is undisputed that Delverde was not the direct recipient of any subsidy. The question is whether Delverde was an indirect recipient by having purchased assets from a company that did directly receive one. As we stated earlier, the statute does not permit Commerce simply to assume that Delverde received a pro rata portion of those subsidies.

Had Commerce fully examined the facts, it might have found that Delverde paid full value for the assets and thus received no benefit from the prior owner's subsidies, or Commerce might have found that Delverde did not pay full value and thus did indirectly receive a "financial contribution" and a "benefit" from the government by purchasing its assets from a subsidized company "for less than adequate remuneration." *See* 19 U.S.C. §§ 1677(5)(D)(iii), (E)(iv); 9 C.F.R. § 351.511(a)(2). Commerce might have reached the conclusion that Delverde indirectly received a subsidy by other means.

Contrary to the government's contentions, our interpretation is not inconsistent with our *Saarstahl II* decision. First, we explicitly stated in *Saarstahl II* that our decision was based on the Tariff Act before it was amended by the URAA, *see Saarstahl II*, 78 F.3d at 1543, and we reserved judgment as to whether the methodology Commerce used in that case would be acceptable under the new statutory scheme. *See id.* Furthermore, our deference to Commerce's methodology then was based on our determination that the former statute was *ambiguous* as to whether Commerce had to find a competitive advantage or effect on the subsequent purchaser's production. *See id.* at 1544.

In contrast, the amended Tariff Act is not ambiguous as to the issue now presented. The statute clearly states that Commerce must determine that a person received both a financial contribution and a benefit, either directly or indirectly, through one of the acts enumerated, and provides no presumption for any change of ownership situation. Any ambiguity that was present in the former statute was eliminated by the URAA amendments. Commerce's methodology is inconsistent with the plain language of the amended statute.

In addition, the issue in *Saarstahl II* was different from the issue before us now. In that case Commerce found that certain debt forgiveness granted to the government-owned predecessor company at the time it was sold and transformed into a private company amounted to a countervailable subsidy to the newly-formed private company. Commerce determined that that debt forgiveness was one of the terms of the sale that served to benefit the newly formed company and therefore that the subsidy "passed through" to the privatized company following the sale regardless of the fact that the sale was at arm's length. *See* 58 Fed.Reg. 37,315 (1993). The Court of International Trade vacated Commerce's decision on the ground that an arm's length sale automatically and necessarily extinguished any and all prior subsidies. *See Saarstahl I*. On appeal, we reversed the lower court (as did Congress, *see supra*), holding that Commerce's methodology was reasonable, that the court erroneously construed the statute to

require that Commerce find that a competitive advantage had been passed on in the privatization transaction, and that the Tariff Act did not require such a finding of competitive advantage or effect. *See Saarstahl II*, 78 F.3d at 1543. Thus, the issue in *Saarstahl II* was not the issue here—whether Commerce could conclusively *presume* that part of the subsidy flowed through—because Commerce did not make that presumption in that case. Rather, Commerce looked at the terms of the transaction and specifically found that because the subsidy was one of the terms of the deal, the newly formed company indirectly received a subsidy. The only issue was whether an additional finding of competitive advantage was required before Commerce could countervail those subsidies. Our holding today that the amended statute requires that Commerce must make specific findings of financial contribution and benefit before concluding that a purchaser indirectly received subsidies previously granted to the seller is therefore not inconsistent with our *Saarstahl* holding.

There is no dispute that in this case, unlike in *Saarstahl II*, the government played no role in the deal struck between the parties to the sale, and the subsidies were not made as a *quid pro quo* for Delverde's purchase. There is also no dispute that the parties were unrelated to one another, and no suggestion that they attempted to exploit a loophole in the countervailing duty laws.

Nor do *British Steel* and *Inland Steel* mandate a different outcome. Like *Saarstahl*, those cases involved the privatization of government-owned and subsidized firms, and we affirmed on the basis of *Saarstahl II. See British Steel*, 127 F.3d at 1475; *Inland Steel*, 155 F.3d at 1374. Again, we were interpreting Commerce's methodology under the earlier statute, which we had already held was ambiguous, so we deferred to Commerce's interpretation that was not an unreasonable construction of that statute. Those cases were thus limited to the privatization context and to the validity of Commerce's

methodology under the earlier version of the Tariff Act.

Finally, we note that there are significant differences between privatization and private-to-private sales. The government has different concerns from those of a private seller. Unlike a private seller who seeks the highest market price for its assets, the government may have other goals, such as employment, national defense, and political concerns, which may affect the terms of a privatization transaction. Thus, a case involving privatization does not necessarily govern a private-to-private situation.

While this appeal was pending before this court, a dispute panel of the World Trade Organization (WTO) issued a decision holding that Commerce's countervailing determination in the *British Steel* case, which involved the same methodology as in this case, was not in accordance with the definition of a "subsidy" as stated in the Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, Annex 1A, Agreement on Subsidies and Countervailing Measures, Pt. I, Art. 1, 1994 WL 761483 (1994). Specifically, the panel held that the privatization of a government-owned company in an arm's length, fair market value transaction eliminates any "benefit" from pre-privatization subsidies and, therefore, no "benefit" from those subsidies can be attributable to the successor privatized company. *See* WTO Dispute Panel Report on United States—Imposition of Countervailing Duties on Certain Hot–Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom, No. WT/DS138/R, at 39–50 (Dec. 23, 1999). Because we hold Commerce's methodology to be invalid under the amended Tariff Act irrespective of the WTO's decision, we do not consider the relevance of that decision except to note that it is not inconsistent with our holding.

We accordingly vacate the decision of the Court of International Trade and instruct that court to remand the case for Commerce to determine, based on the facts and circumstances, including the

**1370**

terms of the transaction, whether Delverde indirectly received a subsidy, *i.e.,* a "financial contribution" and a "benefit," from the Italian government by purchasing the assets involved from the former subsidized owner. If Commerce cannot factually support such a determination, it must recalculate Delverde's countervailing duties for 1994 without regard to the former owner's subsidies.[4]

## CONCLUSION

Commerce's methodology for determining whether Delverde received a countervailing subsidy is invalid as being inconsistent with 19 U.S.C. § 1677(5). For the reasons stated above, the decision of the Court of International Trade is

*VACATED* and *REMANDED*.

---

4. It is undisputed that Delverde did receive other subsidies directly from the Italian government in 1994.