**Slip Op. 03-97**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| ILVA LAMIERE E TUBI S.R.L. and ILVA S.P.A.,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>  and<br><br>BETHLEHEM STEEL CORPORATION and UNITED STATES STEEL CORPORATION,<br><br>      Defendant-Intervenors. | Court No. 00-00127 |

[The U.S. Department of Commerce's countervailing duty determination is sustained in part, and remanded for further calculations in accordance with this Opinion.]

Dated: July 29, 2003

Hunton & Williams (William Silverman and Richard P. Ferrin) for plaintiffs ILVA Lamiere e Tubi S.r.l. and ILVA S.p.A.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Michael S. Dufault, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (John F. Koeppen), of counsel, for defendant United States.

Dewey Ballantine LLP (John A. Ragosta, John R. Magnus, and Hui Yu) for defendant-intervenors Bethlehem Steel Corporation and United States Steel Corporation.

Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, Lynn D. Maloney, and Eric R. McClafferty) for amici curiae Allegheny Ludlum Corporation, AK Steel Corporation, J&L

Specialty Steel, Inc., Lukens, Inc., North American Stainless, Butler Armco Independent Union, Zanesville Armco Independent Union, and the United Steelworkers of America, AFL-CIO/CLC.

## OPINION

**GOLDBERG, Senior Judge:** At issue in this case is the method employed by the U.S. Department of Commerce (the "Department") to calculate subsidies in countervailing duty investigations of newly privatized companies. Plaintiffs ILVA Lamiere e Tubi S.p.A. ("ILT") and ILVA S.p.A. ("New ILVA") also challenge the Department's decision to impose countervailing duties on early retirement benefits provided by the Government of Italy.

## I. Facts

The following facts are taken from the Department's original determination in this case. Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate From Italy, 64 Fed. Reg. 73,244 (Dec. 29, 1999) ("Determination"). Before describing the history of the Plaintiffs, New ILVA and ILT, in greater detail, it is helpful to have a general understanding of the key predecessors to the New ILVA and ILT. In the 1980s and early 1990s, several Italian producers of carbon steel plate were owned by the Italian government's holding company, Istituto per la Ricostruzione Industriale ("IRI"). In 1988, ILVA S.p.A. ("Old ILVA") was formed to replace prior producers of carbon steel plate. In 1993, a subsidiary of Old ILVA was created to produce the carbon

steel plate, named ILVA Lamiere e Tubi ("ILT"). Later in 1993, ILVA Laminati Piani ("ILP") was formed to replace Old ILVA. On April 28, 1995, IRI sold ILP, and consequently its subsidiary ILT, to a group of private investors led by Riva Acciaio S.p.A. ("RIVA"). The RIVA consortium reinstated the name ILVA S.p.A. ("New ILVA") in place of "ILP" in 1997.

The following is a more detailed history of New ILVA and ILT. Prior to 1981, Finsider S.p.A. ("Finsider") was a subsidiary wholly owned by the Italian government's holding company, IRI. Finsider's subsidiary Italsider produced the subject merchandise, carbon steel plate. Determination at 73,245.

In 1981, Italy sought and gained approval from the European Commission for a plan to restructure Finsider. Id. Finsider was restructured, and most of Italsider's assets were transferred to Nuova Italsider. Italsider became a holding company, with Nuova Italsider's stock as its primary asset. Nuova Italsider became the producer of the subject merchandise. In 1987, due to restructuring by Finsider, Nuova Italsider spun-off its assets to Italsider. Id. Italsider reclaimed its position as the producer of the subject merchandise. Nuovo Italsider ceased to exist.

In 1988, Finsider was reorganized again, with the approval of the European Commission. Determination at 73,245. The 1988 reorganization resulted in the closure of many of Finsider's

facilities and the placement of some assets and liabilities in the newly formed company, Old ILVA. The remaining liabilities and assets remained with Finsider. When Finsider's assets were sold, the excess debt was assumed by IRI. Determination at 73,250. Production of the subject merchandise was transferred from Italsider to Old ILVA.

In 1992, a wholly-owned subsidiary of Old ILVA was created, ILT, to produce carbon steel plate. Old ILVA, together with all of its subsidiaries, was wholly-owned by IRI. After becoming insolvent in 1993, Old ILVA entered into liquidation. Also in 1993, the Government of Italy sought the European Commission's approval for restructuring and privatizing Old ILVA. Determination at 73,251. The Government of Italy planned to absorb the bulk of Old ILVA's debt. As a condition of approval, the European Commission required Italy to reduce steel production. Since a decrease in production would necessarily lead to workforce reductions, the European Commission authorized Italy to implement early retirement benefits under Law 451/94. Id. at 73,253. Under Law 451/94, up to 17,100 Italian steel workers from 1994 to January of 1997 were allowed to take early retirement. The benefits would continue to each employee until that employee reached his or her natural retirement age.

Benefits could not be received for more than ten years.[1]  Id. at 73,253.

Pursuant to the reorganization and privatization plan, on December 31, 1993, ILP and Acciai Speciali Terni were formed from the main productive assets and some of the liabilities of Old ILVA.  ILT was transferred to ILP as its wholly-owned subsidiary. "The remainder of [Old ILVA's] assets and existing liabilities, along with much of the redundant workforce, was placed in ILVA Residua (a.k.a., ILVA in Liquidation)."  Id. at 73,245.

A competitive public tender by IRI in 1995 resulted in the sale of 100 percent of ILP to a consortium of investors led by RIVA.  All shares of ILP were transferred to the consortium on April 28, 1995.  After that date, the Government of Italy no longer had any ownership interest in ILP or any of ILP's owners.

On January 1, 1997, RIVA changed the name of ILP to "ILVA S.p.A." ("New ILVA").  New ILVA then owned ILT.  The subject merchandise is produced at ILT's Taranto Works facility.  In 1998, RIVA owned 82 percent of New ILVA, and two foreign investment companies owned the remaining 18 percent.

## II.  Procedural Background

In 1999, the Department issued its original determination. Determination.  The Department found that countervailable

---

[1]  The Department considered the benefits under Law 451/94 as "recurring grants expensed in the year of receipt." Determination at 73,254.

subsidies continued to flow to New ILVA during the 1998 calendar year, the period of review for the investigation.  The countervailable subsidies included debt forgiveness and equity infusions given to New ILVA's predecessors prior to the privatization sale to RIVA.  Additionally, the Department determined that the Government of Italy's pre-privatization early retirement benefits were countervailable subsidies.

While the Determination was on appeal to the Court of International Trade, the Federal Circuit issued Delverde SrL v. United States, 202 F.3d 1360 (Fed. Cir. 2000) (Delverde III). The Federal Circuit in Delverde III determined that Congress's intent under 19 U.S.C. § 1677(5)(F)[2] was for the Department to "examin[e] the particular facts and circumstances of the sale and determin[e] whether [the purchaser] directly or indirectly received both a financial contribution and benefit from the government."  202 F.3d at 1364.  In light of the Federal

---

[2]  The statute to determine whether a prior subsidy continues to be countervailable to the new owner of a company reads as follows:

> A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by an administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change of ownership is accomplished through an arm's length transaction.

19 U.S.C. § 1677(5)(F).

Circuit's decision in <u>Delverde III</u>, the Court remanded the <u>Determination</u> to the Department. <u>See</u> Order of Aug. 30, 2000 (granting the Department's motion for voluntary remand) (<u>ILVA I</u>). The result of <u>ILVA I</u> was the Department's <u>Final Results of Redetermination Pursuant to Court Remand: ILVA Lamiere e Tubi S.p.A. v. United States, Court No. 00-03-00127</u> (Dec. 28, 2000) ("<u>First Redetermination</u>"). The Department concluded that the pre-sale and post-sale ILVA's were the same "person," and thus the post-sale ILVA received a financial contribution and benefit from subsidies given to pre-sale ILVA.[3]

During the Court's review of the <u>First Redetermination</u>, Plaintiffs moved for summary judgment, asking the Court to remand the <u>First Redetermination</u> to the Department. The Court concluded that the Department's "same-person" test failed to take into account the facts and circumstances of the sale, as directed in <u>Delverde III</u>.[4] Accordingly, the Court granted Plaintiffs'

---

[3] For ease of reference, "pre-sale ILVA" refers to ILP prior to its sale to RIVA. "Post-sale ILVA" includes both New ILVA and ILP after its sale to RIVA.

[4] The Department has recently published its modified change-in-ownership methodology. The Department has abandoned its "same-person" methodology found in the <u>First Redetermination</u>. Instead, the Department has adopted the following analysis:

> The methodology is based on certain rebuttable presumptions . . . [t]he 'baseline presumption' is that non-recurring subsidies can benefit the recipient over a period of time . . . normally corresponding to the average useful life of the recipient's assets. However, an interested party may rebut this baseline

motion, and remanded the First Redetermination to the Department.
ILVA Lamiere e Tubi S.p.A. v. United States, 196 F. Supp. 2d 1347
(CIT 2002) ("ILVA II").  The Court instructed the Department to
examine the facts and circumstances of the sale to determine
whether the post-sale ILVA received a financial contribution and
a benefit from the Government of Italy.  ILVA II at 1351; see
also Delverde III at 1364.  The Department reluctantly complied,
and issued the Results of Redetermination Pursuant to Court
Remand: ILVA Lamiere e Tubi S.r.L. and ILVA S.p.A. v. United
States, Court No. 00-03-00127, Remand Order (CIT March 29, 2002)
(July 2, 2002)("Second Redetermination").

There are two remaining issues for the Court to decide.
First, the Court must decide whether the Department followed the
Court's instructions in the Second Redetermination.  Plaintiffs
and the Department ask the Court to sustain the Second
Redetermination.  Defendant-Intervenors Bethlehem Steel
Corporation and United States Steel Corporation (collectively,
"Domestic Producers") have moved for summary judgment to remand

---

presumption by demonstrating that, during the
allocation period, a privatization occurred in which
the government sold its ownership of all or
substantially all of a company or its assets, retaining
no control of the company or its assets, and that the
sale was an arm's-length transaction for fair market
value.

Notice of Final Modification of Agency Practice Under Section 123
of the Uruguay Round Agreements Act, 68 Fed. Reg. 37,125 (June
23, 2003).

the Second Redetermination.  The Domestic Producers argue that the Court should remand again to the Department, with revised instructions on Delverde III's application to the present case.  Second, Plaintiffs had previously moved for summary judgment on the Department's decision to impose countervailing duties on pre-privatization early retirement benefits provided by the Government of Italy under Law 451/94.  The Court did not resolve that issue in ILVA II, and will do so now.

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

### III.  Standard of Review

The Court reviews the Second Redetermination to determine if it is supported by substantial evidence on the record or otherwise in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B) (1994).  To determine if the Department's interpretation of the statute is in accordance with law this Court "must determine whether Congress's purpose and intent on the question at issue is judicially ascertainable."  Timex V.I. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).  The expressed will or intent of Congress on a specific issue is dispositive.  See Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 233-237 (1986).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229

(1938); accord <u>Matsushita Elec. Indus. Co., Ltd. v. United States</u>, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966) (citations omitted).

## IV.  Discussion

### A.    The Department Followed the Court's Instructions Regarding Application of <u>Delverde III</u> in the <u>Second Redetermination</u>

The Court remanded the Department's <u>First Redetermination</u>, and directed the Department to "'examin[e] the particular facts and circumstances of the sale and determin[e] whether [plaintiffs] directly or indirectly received both a financial contribution and benefit from the government.'"  <u>ILVA II</u> at 1351 (quoting <u>Delverde III</u>, 202 F.3d at 1364).  In the Department's <u>Second Redetermination</u>, the Department reluctantly followed the Court's instructions.

The Department analyzed the following facts and circumstances in its analysis:

> We believe that the existence of an open selling process resulting in numerous expressions of interest and multiple bidders submitting offers for the company provided a good indication that full value had been paid.  The information on the record of this proceeding shows that IRI sought at the outset of the privatization process to bring in many bidders for ILP. The announcement of its intent to sell ILP and its solicitation of expressions of interest in the company were widely publicized.  There were no restrictions placed on foreign ownership of ILP and IRI set no

minimum bid price.  Further, no level of investment in
ILP was stipulated by the [Government of Italy]. . . .
[C]omparison of the price actually paid for ILP to
market valuations of the company show that full and
fair market value was paid for ILP.

Second Redetermination at 8-9.  The Department concluded, after

analyzing the facts and circumstances of the sale and

privatization of pre-sale ILVA, that post-sale ILVA did not

receive a financial contribution or benefit from the Government

of Italy.  Id. at 10.

The Domestic Producers argue that the Court should remand

the Second Redetermination to the Department, with new

instructions regarding Delverde III's application to the

investigation of New ILVA.  The Domestic Producers do not raise

any legal arguments in their motion for summary judgment that

were not already addressed in ILVA II.  Additionally, the

Domestic Producers do not challenge any of the facts relied upon

by the Department in its Second Redetermination.  Therefore, the

Domestic Producers motion for summary judgment is denied.

Because the Department followed the Court's instructions in ILVA

II, the Court sustains the Department's Second Redetermination on

the issue of calculating subsidies in countervailing duty

investigations of newly privatized companies.  See generally,

Allegheny Ludlum Corp. v. United States, 26 CIT __, 246 F. Supp.

2d 1304 (2002) ("Allegheny"), and GTS Industries S.A. v. United

States, 26 CIT __, 246 F. Supp. 2d 1311 (2002) ("GTS") (the

Department's determinations were sustained after the Department

analyzed the facts and circumstances of the privatization sales).

**B.    The Department's Determination to Countervail Early
        Retirement Benefits was in Accordance with Law**

Under 19 C.F.R. § 351.513 (2000), New ILVA received a

benefit to the extent that the early retirement benefits relieved

ILVA of an obligation it normally would incur.[5]  Plaintiffs argue

that the early retirement benefits are not an obligation that

ILVA would normally incur.  Absent the European Commission's

mandated production cutback in the steel industry, the Italian

government would not have needed to provide early retirement

benefits under Law 451/94.  Plaintiffs also point out that the

Department has previously expressed unwillingness to countervail

benefits given to foreign producers that are provided to offset

---

[5]  The applicable regulation, "Worker-related subsidies",
reads as follows:

> (a)  *Benefit.*  In the case of a program that provides
> assistance to workers, a benefit exists to the extent
> that the assistance relieves a firm of an obligation
> that it normally would incur.
> (b)  *Time of receipt of benefit.*  In the case of
> assistance provided to workers, the Secretary normally
> will consider the benefit as having been received by
> the firm on the date on which the payment is made that
> relieves the firm of the relevant obligation.
> (c)  *Allocation of benefit to a particular time period.*
> Normally, the Secretary will allocate (expense) the
> benefit from assistance provided to workers to the
> yearin which the benefit is considered to have been
> received under paragraph (b) of this section.

19 C.F.R. § 351.512.

any industry-specific, increased legal requirements imposed by the foreign government.

The Department denies that Plaintiffs' characterization of the Department's view is accurate: the Department does not view benefits provided to offset increased legal requirements as not countervailable. See Determination at 73,273. Regardless of which view the Department has taken, it is clear that the Department's determination is in accordance with law and supported by substantial evidence. The evidence shows that the capacity reductions and resulting layoffs were merely conditions placed upon pre-sale ILVA by the European Commission. Determination at 73,253. Pre-sale ILVA had to satisfy the conditions to receive the European Commission's approval for its 1993-94 reorganization plan. See Determination at 73,253-54, 73,272-73. Plaintiffs offer no evidence that the reorganization plan approved by the European Commission was imposed upon pre-sale ILVA outside of the Italian Government's request to further subsidize pre-sale ILVA in preparation for its privatization. Therefore, because the Department's determination is supported by substantial evidence and is in accordance with law, the Department's determination that Law 451/94 is countervailable is sustained.

Although the Department was correct that Law 451/94 is a countervailable subsidy, the Department's current antidumping

subsidy rate of 2.06 percent *ad valorem* under Law 451/94 cannot stand.  In its Second Redetermination, the Department failed to recalculate the Law 451/94 countervailable subsidy.  Since the Second Redetermination concluded that subsidies to pre-sale ILVA are not countervailable, and because many of the payments under Law 451/94 were made to employees that retired prior to new ILVA's privatization, a reassessment of the countervailable subsidy is required.  The following payments under Law 451/94 may not be countervailed:

(1)  Payments under Law 451/94 to employees that were transferred to ILVA Residua in 1993 and 1994 are not countervailable.[6]  When pre-sale ILVA was reorganized in 1993 and 1994, redundant employees were placed in ILVA Residua.  Determination at 73,254.  The redundant employees were not part of pre-sale ILVA when purchased by RIVA. Therefore, since the Department has determined that subsidies to pre-sale ILVA did not benefit post-sale ILVA, no payments to retired employees of ILVA Residua are countervailable subsidies to the New ILVA.

(2)  Payments made to employees who retired prior to the share transfer on April 28, 1995, under Law 451/94, are not countervailable subsidies.  Because the Department has

---

6  In its Determination, the Department had calculated new ILVA's countervailable subsidy to be 0.66 percent *ad valorem* for employees transferred to ILVA Residua.  Determination at 73,254.

determined that subsidies to pre-sale ILVA do not benefit New ILVA, no payments to employees who retired prior to the privatization of pre-sale ILVA are countervailable. Therefore, the Determination is remanded to the Department to calculate the countervailable subsidies under Law 451/94. The countervailable payments under Law 451/94 are payments to those employees who retired from post-sale ILVA after April 28, 1995.

## V. Conclusion

Thus, the Department's Second Redetermination is in accordance with law and supported by substantial evidence on the issue of calculating subsidies in countervailing duty investigations of newly privatized companies. The Domestic Producers motion for summary judgment is accordingly denied. The finding in the Determination that Law 451/94 is a countervailable subsidy is in accordance with law and supported by substantial evidence. However, this matter is remanded to the Department to calculate the countervailable subsidy rate under Law 451/94 in accordance with this Opinion. Therefore, the Department's Determination and Remand Determination are sustained in part and remanded in part.

                                        _____
                                        **Senior Judge Richard W. Goldberg**

**Date: July 29, 2003**
      **New York, New York**